J-S15028-17

2018 PA Super 71

| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| Appellant | |
| v. | |
| MIGUEL DIAZ | |
| | No. 1811 EDA 2016 |

Appeal from the PCRA Order May 12, 2016
In the Court of Common Pleas of Bucks County
Criminal Division at No(s): CP-09-CR-0006973-2007

BEFORE:  BOWES, J., DUBOW, J., AND FORD ELLIOTT, P.J.E.

DISSENTING OPINION BY BOWES, J.:          **FILED MARCH 23, 2018**

I respectfully dissent, as I do not believe that the presumptive prejudice doctrine announced in **United States v. Cronic**, 466 U.S. 648 (1984), applies to these facts.  I would apply **Strickland v. Washington**, 466 U.S. 668 (1984), to this case, and reverse the PCRA court's grant of a new trial as Appellee failed to establish prejudice pursuant to those principles.

**I**

Presumptive prejudice is not warranted

**A**

Cronic versus Strickland

The PCRA court determined that Appellee established prejudice under **Strickland**.  The learned Majority does not discuss that analysis, as it affirms on the alternative legal ground of presumptive prejudice flowing from one

particular circumstance: difficulties arising from the fact that Appellee spoke English as a second language. By electing to apply *Cronic*, the Majority has lifted from Appellee the burden of explaining how the presence of an interpreter would have made any difference at trial, and, as such, Appellee did not have to establish a reasonable probability that the ultimate outcome would have been any different. Appellee would need to establish that probability under *Strickland*.

In *Mickens v. Taylor*, 535 U.S. 162 (2002), the United States Supreme Court summarized the distinction between these two doctrines.

> The Sixth Amendment provides that a criminal defendant shall have the right to "the Assistance of Counsel for his defence." This right has been accorded, we have said, "not for its own sake, but because of the effect it has on the ability of the accused to receive a fair trial." *United States v. Cronic*, 466 U.S. 648, 658, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984). It follows from this that assistance which is ineffective in preserving fairness does not meet the constitutional mandate, *see Strickland v. Washington*, 466 U.S. 668, 685–686, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); and it also follows that defects in assistance that have no probable effect upon the trial's outcome do not establish a constitutional violation. . . . .

> There is an exception to this general rule. We have spared the defendant the need of showing probable effect upon the outcome, and have simply presumed such effect, **where assistance of counsel has been denied entirely or during a critical stage of the proceeding**. When that has occurred, the likelihood that the verdict is unreliable is so high that a case-by-case inquiry is unnecessary. But only in "circumstances of that magnitude" do we forgo individual inquiry into whether counsel's inadequate performance undermined the reliability of the verdict.

*Id*. at 166 (some citations omitted, emphasis added). As our Supreme Court observed in **Commonwealth v. Reaves**, 923 A.3d 1119 (Pa. 2007), there is a common thread in cases applying the **Cronic** presumption:

> [T]he defining feature of all of these cases is that the acts or omissions of counsel were of the type that are virtually certain to undermine confidence that the defendant received a fair trial or that the outcome of the proceedings is reliable, primarily because they remove any pretension that the accused had counsel's reasonable assistance during the critical time frame. In this regard, it is worth noting that the portion of the **Cronic** decision explaining the theory underlying the concept of presumptive prejudice begins by observing that effective assistance is constitutionally guaranteed not for its own sake, but because of its effect upon the accused's ability to receive a fair trial.

*Id*. at 1128.

Herein, Appellee was neither denied counsel entirely nor denied counsel at a critical stage, and therefore that defining feature is absent. The United States Supreme Court has stated that **Cronic** "is reserved for cases in which counsel fails meaningfully to oppose the prosecution's case." **Florida v. Nixon**, 543 U.S. 175, 179 (2004) (refusing to apply **Cronic** where counsel in death penalty case conceded guilt and focused on sentencing, as the defendant neither agreed nor disagreed with that tactic). Even if Appellee were completely unable to speak English, a circumstance that is not at issue, I do not see how the language barrier hampered **counsel** in his efforts to oppose the prosecution's case. A defendant's inability to understand the proceedings would not interfere with that fundamental task, except to the extent that the language barrier precluded the defendant from assisting

counsel during the trial. A defense attorney can still litigate a case and undercut the Commonwealth's attempts to establish proof beyond a reasonable doubt even if the defendant is not present in the courtroom. In other words, it is not inherently illogical to conclude that an attorney could render effective assistance even when the defendant is completely absent.

**B**

Structural error

My esteemed colleagues in the Majority do not appear to dispute the above point; instead, they find that counsel was ineffective for failing to timely secure a translator. Next, the Majority finds that Appellee could not understand the proceedings against him, which implicates his own constitutional rights, including the right to be present at trial. The Majority links the violation of his constitutional rights to counsel's ineffective failure to request the interpreter.[1] By dispensing with the need to establish prejudice as it pertains to this ineffectiveness, *i.e.*, a showing that counsel's error undermines confidence in the verdict, the Majority determines that the error is structural. That label attaches to "a very limited class of errors that trigger

---

[1] More specifically, the actual error is trial counsel's failure to object. Counsel's request for an interpreter was granted, but the judge stated that one could not be immediately provided due to the timing of the request. He agreed to provide an interpreter and stated that the case would proceed with jury selection and opening statements, but not testimony. The complainant nevertheless testified before a translator was present, and counsel failed to object. A translator was then provided after the first day.

automatic reversal because they undermine the fairness of a criminal proceeding as a whole." *United States v. Davila*, 133 S.Ct. 2139 (2013) (citation omitted). I agree that a criminal defendant's complete inability to understand the proceedings against him would be a serious constitutional error, but the Majority does not explain why the facts herein rose to that level. The Majority reaches its conclusion by citing *Commonwealth v. Tolbert*, 369 A.2d 791 (Pa.Super. 1977) and *Commonwealth v. Pana*, 364 A.2d 895 (Pa. 1976). At the outset, it must be noted that both of these cases pre-date the seminal *Strickland* and *Cronic* cases, and therefore do not control our analysis of the prejudice inquiry. Nevertheless, I will assume that the concepts are pertinent to this appeal.

In *Tolbert*, trial counsel erroneously informed the defendant that he was not required to be present on the day his case was called to trial, and jury selection proceeded in his absence. We reversed without inquiry into prejudice, stating that the right to be present at all stages of the trial is absolute. In *Pana*, our High Court held that a trial judge's refusal to appoint an interpreter to allow a defendant to testify in Spanish was a denial of the right to testify. *Pana* observed in passing that the "failure to understand the proceedings may deny him . . . his right to be present at his own trial." *Id*. However, *Pena*'s holding was limited to the right to testify. "[T]he court's refusal to permit the use of the interpreter denied appellant his right to testify effectively in his own behalf and was prejudicial error." *Pana*, *supra* at 898.

This case bears little resemblance to **Pana**, legally or factually. Legally, **Pana** implicated the right of a defendant to testify on his own behalf. Factually, the prosecutor in that case joined in the request for an interpreter, and the judge "implied before the jury that appellant's language difficulty was a fabrication." **Id**. at 897. That extreme level of dysfunction is not present herein, and the record is clear that Appellee could speak and understand English. Indeed, the PCRA court's factual findings noted the same. For example, the PCRA court issued this finding of fact:

> Several telephone calls the Defendant made in prison were introduced into the record and played at the post-sentence hearings; the calls showed that when speaking to his daughter, [M.D], he would speak mostly in English, with [M.S.]'s son [M] in English and Spanish, and with his eldest daughter, [MA.D.], mostly in Spanish.

PCRA Court Opinion I, 5/13/16, at 37.

The Majority's attempt to align Appellee's circumstances with those cases rests on its deference to other findings by the PCRA court. Specifically, the Majority finds that this case is analogous to **Tolbert**, which dealt with an actually absent defendant. The Majority states that the language barrier in this case meant that Appellee was constructively absent, and, pursuant to **Tolbert**, there is no need to establish prejudice.

I disagree. As quoted, the PCRA court recognized that Appellee could speak English, which places this case within **Strickland**. **See Commonwealth v. Walls**, 993 A.2d 289 (Pa.Super. 2010) (remanding for

evidentiary hearing where defendant suffered from a significant hearing impairment and counsel failed to secure an interpreter; citing **Strickland** prejudice prong). Nevertheless, the Majority transforms a factual finding into a legal conclusion, by emphasizing this additional finding: Appellee "did not understand what was occurring during the pre-trial motions proceedings, jury selection, or opening arguments, and did not understand about half of the complainant's testimony." PCRA Opinion I, 5/12/16, at 36-37. The Majority treats this finding as equivalent to its legal conclusion that structural error occurred. "As noted above, the PCRA Court's conclusion in the instant case— that Appellee's inability to understand English was such that he could not participate adequately in the proceedings without a translator—is well supported." Majority Opinion at 12.

I hasten to agree that we are bound by the PCRA court's factual determinations, and there is little doubt that an interpreter was helpful; the fact that one was used for most of the trial is itself evidence of its utility.[2] However, the fact that Appellee had some difficulty understanding the

_____

[2] Simultaneously, the fact that a translator was present for large portions of the trial undermines the Majority's finding that structural error occurred. Furthermore, the judge who presided over the PCRA proceedings was not the original trial judge. In this respect, deference to a finding that Appellee experienced difficulties at trial, as opposed to at the PCRA hearing, is arguably unwarranted. Nevertheless, I will accept that finding as it makes no difference to my analysis.

proceedings when the interpreter was not present is not the same as a finding that the absence of the interpreter amounted to structural error.

In concluding Appellee is entitled to a new trial, the Majority finds that Appellee's language comprehension difficulties were the same as not being present at all. I submit that is a legal conclusion, not a factual one, which we must analyze *de novo*. The Majority does not engage in a *de novo* analysis, and dispenses with the need to do so by asserting that the incontrovertible fact that Appellee spoke and understood English does not undercut its legal conclusion. "[W]e . . . believe that the findings discussed in the body of this Opinion overwhelmingly support the PCRA Court's conclusion that Appellee could not understand the criminal proceedings." Majority Opinion at 8, n.5.

I fail to see how this Court can conclude that Appellee was completely unable to speak or understand English, even though Appellee spoke and understood English. The latter finding necessarily negates the former, and by definition any contrary finding is not supported by the record. However, even if those two points were somehow not in direct conflict, I must note that the PCRA court declined to find that which the Majority attributes to it. The PCRA court's opinion states that Appellee cited **Tolbert** for the proposition that "a defendant deemed not to be present at trial need not show prejudice[.]" PCRA Court Opinion I, 5/13/16, at 40. That is identical to the Majority's holding. **See** Majority Opinion at 14 ("Attorney Walfish's failures are analogous to the attorney's failure in **Tolbert**[.]"). However, despite an invitation to make the

same conclusion made by the Majority, the PCRA court declined to go so far. "The failure to secure an interpreter, while in and of itself does not merit a new trial in this case, corroborates what Defendant testified to and what this court already knows- that trial counsel was completely unprepared for trial." PCRA Court Opinion I, 5/13/16, at 40. Accordingly, I cannot accept that this alternative basis for relief is supported by the record.

Perhaps the PCRA court did not make that finding because it could not do so. After all, Appellee could plainly speak and understand English, and the PCRA court recognized the same. For example, Appellee testified at the original post-sentence motions hearings.[3] An interpreter was present for those proceedings, but the official transcription shows that Appellee occasionally answered prior to interpretation:

Q. This is Commonwealth-1. Take a look at it.

A. Why do I need to look at it first?

Q. Did you write that?

A. (Answering before interpreted: ) Yes.

---

[3] These hearings discussed whether the trial court erred by failing to provide an interpreter, as opposed to the issue of whether counsel was ineffective for failing to object. The testimony from these hearings was incorporated at the later PCRA hearings.

N.T., 11/13/12, at 99. Appellee also agreed that he could speak English, an unsurprising admission given the fact the Commonwealth possessed audio recordings of Appellee speaking English.

> Q. Mr. Diaz, you do agree that you speak English, correct?
>
> A. (Responding in English: ) Yes.
>
> Q. Do you agree you understand English when it's spoke to you?
>
> A. Not everything exactly, but I do understand a lot.
>
> Q. Do you understand my questions to you in English now?
>
> A. (Responding in English: ) Yes, I do.

*Id*. at 139-40. Appellee also agreed that his supervisor at work communicated with Appellee only in English, and he further agreed that his language skills were such that he could translate to assist other workers.

> Q. Isn't it true that you helped to interpret between English and Spanish these other Spanish speaking workers?
>
> A. Yes.

*Id*. at 144.

Despite the ample evidence of Appellee's ability to speak, write, and even translate into English, to say nothing of Appellee's admission that he "understand[s] a lot" of English, the Majority inexplicably holds that he does not. The legal viability of its finding of a structural error, *i.e.*, the constructive absence from trial due to a language barrier, rests entirely on the completeness of that inability to understand. Therefore, the Majority's legal

conclusion is incorrect. Accordingly, I cannot hold as a matter of law that the failure to request an interpreter constituted a structural error on these facts.

**C**

**_Cronic_ presumptive prejudice versus structural error**

Even if we grant that a structural error did occur, we must address whether Appellee would be automatically entitled to relief without a showing that the error affected the outcome. There is a significant distinction between addressing structural errors on direct review, where the error would result in a new trial without any showing of prejudice whatsoever, and addressing the identical error in a collateral proceeding. In the latter situation, the error must be analyzed through the ineffective assistance of counsel framework, which typically requires that the petitioner establish prejudice.

This is not a minor distinction, and courts have struggled with how to address structural errors on collateral review as an ineffective assistance of counsel claim. This question was recently addressed by the United States Supreme Court in **_Weaver v. Massachusetts_**, 137 S.Ct. 1899 (2017). **_Weaver_** stated that "The two doctrines are intertwined; for the reasons an error is deemed structural may influence the proper standard used to evaluate an ineffective-assistance claim premised on the failure to object to that error." **_Id_**. at 1907. Since in my view **_Weaver_** sheds light on the prejudice inquiry to be applied herein, I will examine the case in some detail.

*Weaver* involved a structural error: the trial court barred members of the public from the courtroom during jury selection, including Weaver's mother and her minister. Trial counsel failed to object, and the issue was not presented on direct review. The Court assumed that the failure to object was ineffectiveness, which resulted in the exact dilemma we face here:

> In the direct review context, the underlying constitutional violation—the courtroom closure—has been treated by this Court as a structural error, *i.e.,* an error entitling the defendant to automatic reversal without any inquiry into prejudice. The question is whether invalidation of the conviction is required here as well, or if the prejudice inquiry is altered when the structural error is raised in the context of an ineffective-assistance-of-counsel claim.

*Id*. at 1905.

Assuming *arguendo* that the failure to provide a translator for some portions of the trial actually amounted to a structural error, we face the same inquiry. Must we invalidate the conviction simply because the error would have resulted in a new trial on direct review? The Majority says yes, but *Weaver* suggests that the answer may be no.

*Weaver* concluded that **Strickland** applied, but limited its holding "[to] the context of trial counsel's failure to object to the closure of the courtroom during jury selection." *Id*. at 1907. Nevertheless, the analysis employed to reach that conclusion offers guidance as to whether we should extend presumptive prejudice to the structural error alleged herein.

First, the High Court offered a helpful review of why many constitutional errors are subject to harmless error analysis, but some are not.

> The concept of structural error can be discussed first. In **Chapman v. California**, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), this Court "adopted the general rule that a constitutional error does not automatically require reversal of a conviction." **Arizona v. Fulminante**, 499 U.S. 279, 306, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991) (citing **Chapman, supra**). If the government can show "beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained," the Court held, then the error is deemed harmless and the defendant is not entitled to reversal. **Id.,** at 24, 87 S.Ct. 824.
>
> The Court recognized, however, that some errors should not be deemed harmless beyond a reasonable doubt. These errors came to be known as structural errors. The purpose of the structural error doctrine is to ensure insistence on certain basic, constitutional guarantees that should define the framework of any criminal trial. Thus, the defining feature of a structural error is that it "affect[s] the framework within which the trial proceeds," rather than being "simply an error in the trial process itself." **Id**., at 310, 111 S.Ct. 1246. For the same reason, a structural error "def[ies] analysis by harmless error standards." **Id.,** at 309, 111 S.Ct. 1246 (internal quotation marks omitted).
>
> **The precise reason why a particular error is not amenable to that kind of analysis—and thus the precise reason why the Court has deemed it structural—varies in a significant way from error to error**. There appear to be at least three broad rationales.

**Id**. at 1907–08 (emphasis added, some citations omitted).

The Court then proceeded to examine the three rationales for classifying a particular constitutional error as structural. The first was that some errors involve a right "not designed to protect the defendant from erroneous conviction but instead protects some other interest." **Id**. at 1908. As it

- 13 -

pertains to this case, there is a Sixth Amendment right to be present at one's own trial. "One of the most basic of the rights guaranteed by the Confrontation Clause is the accused's right to be present in the courtroom at every stage of his trial." *Illinois v. Allen*, 397 U.S. 337, 338 (1970) (rejecting theory that this right is absolute; right to be present can be waived or forfeited). The second rationale was that some errors are "simply too hard to measure" and the efficiency costs of litigating the effect of those errors is unwarranted. This rationale overlaps with one of the reasons for the *Cronic* presumptive prejudice doctrine, "circumstances that are so likely to prejudice the accused that the cost of litigating their effect in a particular case is unjustified." *Cronic*, *supra* at 658. The third rationale was that some errors "always result . . . in fundamental unfairness." *Weaver*, *supra* at 1908. The Court cited the failure to provide an attorney or the failure to give a reasonable doubt instruction as examples of this type. *Id*. Finally, the Court recognized that "more than one of these rationales may be part of the explanation for why an error is deemed to be structural." *Id*. The Court reiterated the principle that an error may be structural even if it does not always lead to fundamental unfairness. *Id*.

Having set forth those three rationales, the Court discussed why the deprivation of the right to a public trial constituted structural error. *Id*. at 1910. The *Weaver* Court then explained that, while that right was structural,

- 14 -

it did not necessarily follow that a violation of that right rendered the trial fundamentally unfair.

> Indeed, the Court has not said that a public-trial violation renders a trial fundamentally unfair in every case. In the two cases in which the Court has discussed the reasons for classifying a public-trial violation as structural error, the Court has said that a public-trial violation is structural for a different reason: because of the difficulty of assessing the effect of the error.

> The public-trial right also protects some interests that do not belong to the defendant. After all, the right to an open courtroom protects the rights of the public at large, and the press, as well as the rights of the accused. So one other factor leading to the classification of structural error is that the public-trial right furthers interests other than protecting the defendant against unjust conviction. These precepts confirm the conclusion the Court now reaches that, **while the public-trial right is important for fundamental reasons, in some cases an unlawful closure might take place and yet the trial still will be fundamentally fair from the defendant's standpoint**.

*Id*. at 1910 (emphasis added, quotation marks and citations omitted).

Having concluded the structural error in question did not mean that that the trial should automatically be deemed fundamentally unfair, the Court reached the important question of prejudice. While acknowledging that Weaver would have been automatically entitled to a new trial on direct review, the Court determined that the same result was not warranted on collateral review.

> The prejudice showing is in most cases a necessary part of a **Strickland** claim. . . . That said, the concept of prejudice is defined in different ways depending on the context in which it appears. In the ordinary **Strickland** case, prejudice means a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.

But the **Strickland** Court cautioned that the prejudice inquiry is not meant to be applied in a mechanical fashion. For when a court is evaluating an ineffective-assistance claim, the ultimate inquiry must concentrate on the fundamental fairness of the proceeding. Petitioner therefore argues that under a proper interpretation of **Strickland**, even if there is no showing of a reasonable probability of a different outcome, relief still must be granted if the convicted person shows that attorney errors rendered the trial fundamentally unfair. For the analytical purposes of this case, **the Court will assume that petitioner's interpretation of Strickland is the correct one**. In light of the Court's ultimate holding, however, the Court need not decide that question here.

*Id*. at 1910–11 (cleaned up).[4]

As emphasized, the Court did not clearly set forth how prejudice was to be applied when reviewing a claim of structural error in the collateral context. The first possibility was the standard **Strickland** analysis: the defendant must show "a reasonable probability of a different outcome in his or her case[.]" *Id*. The second possibility, which the Court assumed without deciding was valid, was that Weaver could have shown "that the particular public-trial violation was so serious as to render his or her trial fundamentally unfair." *Id*. Whether the latter showing is viable is therefore unclear. *See id*. at 1916 ("Weaver's theory conflicts with **Strickland** because it implies that an

---

[4] "Cleaned up" is a new parenthetical designed to "tell readers that they have removed extraneous material for readability and guarantee that nothing removed was important." *See* Metzler, Jack, Cleaning Up Quotations (March 17, 2017). Journal of Appellate Practice and Process, 2018, Forthcoming. Available at http://dx.doi.org/10.2139/ssrn.2935374. The superfluous material encompassed by the parenthetical includes brackets, ellipses, quotation marks, internal citations, and footnote references. Herein, the omitted material is quotation marks and citations to **Strickland**.

- 16 -

attorney's error can be prejudicial even if it 'had no effect,' or only 'some conceivable effect,' on the outcome of his trial. That is precisely what **Strickland** rules out.") (Alito, J., joined by Gorsuch, J., concurring) (citation omitted).

The Majority's belief that a structural error occurred at Appellee's trial would undoubtedly be correct if Appellee was completely unable to understand the proceedings. While I am unaware of any case directly stating that conclusion, I would agree that a trial is fundamentally unfair as described in **Weaver** when the criminal defendant cannot comprehend the proceedings against him due to a language barrier. Furthermore, the effect of such an error on the trial would be almost impossible to measure.

However, as I explained *supra*, there is simply no indication here that Appellee's ability to participate in and understand the proceedings against him was impaired to that extreme. Thus, affirming on this basis is doubly wrong: first, because it is unclear if the error actually was structural given the fact that Appellee understands English, and second, because **Weaver** suggests that the error would not automatically entitle him to a new trial on collateral review even if it would have on direct review.

At the very least, **Weaver** casts doubt on the Majority's conclusion.[5] Given that uncertainty, we should not affirm the PCRA court's grant of a new trial on this alternative basis, especially when the PCRA court declined to find that Appellee was presumptively prejudiced despite being asked to do so. Hence, I would not apply the presumptive prejudice doctrine.

**II**

What remains is whether Appellee did, in fact, establish prejudice under **Strickland**. My distinguished colleagues do not reach that question, and I therefore turn my attention to the **Strickland** framework.

**A**

Appellee's allegations of ineffectiveness

The salient facts are simple. The victim, E.S., alleged that Appellee, her stepfather, raped her over the course of four years while she lived with Appellee and her mother. E.S. also testified that her mother, M.S., knew of the rapes and required E.S. to satisfy Appellee's demands; however, the Commonwealth *nolle prossed* all charges against M.S. after E.S. expressed a reluctance to testify against her mother. Appellee was represented by

---

[5] The Majority claims that **Weaver** is inapplicable because this case involves Appellee's inability to comprehend the proceedings while **Weaver** involves keeping a courtroom open during *voir dire*. That distinction is justified only by its mistaken conclusion that Appellee could not comprehend the proceedings in total. The Majority never asserts that a less than total inability justifies a finding of structural error.

Attorneys Noonan and Walfish, with Attorney Walfish representing Appellee at

the actual trial while Attorney Noonan largely handled pre-trial preparation.

The PCRA petition at issue raised numerous claims, which the PCRA

court summarized as follows:

> The claims raised by Appellee in the PCRA action were as follows: (1) was prior counsel ineffective for being unprepared for trial, for failing to investigate witnesses and evidence and for lacking a viable trial strategy; (2) was counsel ineffective for failing to secure an interpreter for the first day of trial, for sentencing, for pre-sentence investigation and for his consultation with Appellee; (3) was trial counsel ineffective for failing to prepare Appellee for sentencing; and (4) was trial counsel ineffective for failing to meet with Appellee prior to the date of trial.

PCRA Opinion I, 5/12/16, at 5. As reflected, Appellee's overarching theory

was that his two trial attorneys were unprepared to try the case. The following

argument is representative:

> Walfish, the lawyer who was going to and did try the case, testified that his trial strategy was:
>
> > . . . [M.D.] from Florida had the diary and she was going to come and produce the diary that would essentially win the case because of what was in the diary of the child. There was supposedly nothing about her being abused but that she was being pushed around and Miguel Diaz was too authoritative and she couldn't go see her boyfriend and she couldn't do what she wanted to do and she was going to use any means possible to get herself to New York to be with her boyfriend, and that's what the diary was going to say. That's what I fully expected [M.D.] was going to do, and I believe [V.D] was going to testify that she was there when some of the abuse allegedly took place and to her recollection, it never took place that she was aware of and that she also was aware

- 19 -

> that the child wanted to go to New York and that she
> would corroborate what was in the diary.
>
> That was their strategy at least from before the preliminary
> hearing.  Whether or not this was viable—and the Commonwealth
> argues that for a multitude of reasons it was not—they did nothing
> to put it into effect.  Between the preliminary hearing and the trial
> nothing was done to contact the Appellee's daughters until literally
> the eve of trial, even though they knew both were hundreds of
> miles outside of Pennsylvania.

Appellee's brief at 29-30 (citations to reproduced record omitted).

**B**

PCRA court's conclusions of law

The PCRA court issued two opinions in this matter.  The first accompanied the order granting relief.  The second opinion supplemented that writing to respond to the Commonwealth's concise statement of errors complained of on appeal.  These opinions, while nominally applying ***Strickland***, in truth grant a new trial based on a theory of presumptive prejudice owing to lapses in pre-trial preparation.  In its first opinion, the court reasoned:

> Applying [***Strickland***] to counsel's representation in this case
> leads inexorably to the conclusion that trial counsel was
> constitutionally ineffective and that Petitioner must be granted a
> new trial. There is no question that Petitioner's underlying
> allegations of ineffectiveness—Walfish's failure to see Defendant
> until the day of trial, failure to prepare for trial, failure to
> investigate witnesses and evidence, and failure to adopt a viable
> trial strategy—have merit.  Counsel's failure to interview
> witnesses was ineffective, arguably *per se*.
>
> The second prong of establishing ineffectiveness of counsel—
> whether counsel had a reasonable basis for his performance—

- 20 -

requires little reflection and scant discussion. It is not even arguable that counsel's failure to utilize his investigator for four months until the eve of trial could have had any reasonable basis designed to effectuate his client's interest. The other allegations of ineffectiveness, fitting broadly under the rubric of failure to prepare for trial, are not even arguably reasonable tactics serving some broad strategic plan for the defense. "Failure to prepare is not an example of forgoing one possible avenue to pursue another approach; it is simply an abdication of the minimum performance required of defense counsel." **Commonwealth v. Perry**, 644 A.2d 705 (Pa. 1994). It is not possible to provide a reasonable justification for appearing in front of a jury without thorough preparation in a case of this magnitude.

[**Commonwealth v. Pierce**, 527 A.2d 973 (Pa. 1987)] requires that Petitioner demonstrate prejudice flowing from counsel's ineffective representation. Again, we do not think extensive analysis necessary to perceive the prejudice to Petitioner's defense. There is a reasonable probability that counsels' failure to meet with Petitioner; failure to investigate potential witnesses and evidence, and failure to prepare for the penalty phase of trial, in combination, affected the outcome of the trial. This was a case of oath against oath and the defense attorney could have brought in other witnesses to bring out perhaps small points, but the presence of other witnesses would demonstrate that there were people standing behind the defendant that were willing to be on his side. Except for lack of effort, and attention to detail, there was no reason to not present witnesses, which could have been family and/or fellow employees.

PCRA Opinion I, 5/12/16, at 27-28 (some citations omitted).

The Commonwealth's 110 page brief tiresomely parses out credibility findings as contradicted by other portions of the record. Since Appellee prevailed before the PCRA court, we are bound by its credibility findings. The prejudice inquiry, however, is a question of law that is reviewed *de novo*. As emphasized in the foregoing passage, the PCRA court declined to link the pre-trial failures to counsel's performance at trial, stating, "we do not think

extensive analysis necessary to perceive the prejudice to Petitioner's defense."

I respectfully disagree with the learned PCRA judge. Establishing prejudice is

not some collateral matter that can be easily swept aside based on discomfort

with a counsel's pre-trial preparation.

Thus, the PCRA court determined that Appellee established prejudice by

virtue of defective trial preparation, with no reference to performance at trial

or the evidence presented at the PCRA hearing, all of which is to say the PCRA

court implicitly applied **Cronic** to these facts. I do not agree that the

deficiencies in preparation amounted to a constructive denial of counsel, as is

required under the **Cronic** doctrine. Notably, **Cronic**, which established the

concept of presumptive prejudice, did not actually apply that framework.

**Woods v. Donald**, 135 S. Ct. 1372, 1377 (2015) (*per curiam*) ("In **Cronic**

itself, we rejected the defendant's claim that his counsel's lack of experience

and short time for preparation warranted a presumption of prejudice[.]").[6]

---

[6] Nor do I find persuasive reliance by the PCRA court and Appellee upon **Commonwealth v. Brooks**, 839 A.2d 245 (Pa. 2003). **Brooks**, a capital case, established that, at bare minimum, capital counsel must meet with his client in person before trial in order to establish a relationship. **Brooks** found that the failure to do so constitutes prejudice under **Strickland**, because an in-person meeting is necessary to prepare a defense to a charge of murder. Then-Chief Justice Castille authored a concurring opinion, faulting the majority for its prejudice analysis. "The Majority does not conclude that under the circumstances of this case there is a reasonable probability that, but for counsel's failure to meet appellant in person prior to trial, the outcome of the guilt phase of this trial would have been different." **Id**. at 252 (Castille, C.J., concurring). Chief Justice Castille opined, "The Majority's failure to come to

My review of the PCRA court's reasoning demonstrates that the court found that inadequate pre-trial preparation failures resulted in prejudice *per se*, a presumption that I do not find was warranted in this particular case. *See Chadwick v. Green*, 740 F.2d 897, 901 (11th Cir. 1984) ("[A]ny failure of counsel in this case to investigate and pursue all avenues of defense is best characterized as a failure by counsel in the performance of his investigatory

_____

terms with the Sixth Amendment complexity posed by the issue *sub judice* has led it to articulate a rule that cannot be squared with existing and controlling jurisprudence." *Id*. at 252. The Chief Justice concurred in the result, however, finding that prejudice was established *per se* under *Cronic*, because the case was "one of those rare 'circumstances that are so likely to prejudice the accused that the cost of litigating their effect in a particular case is unjustified.'" *Id*. at 255 (quoting *Cronic*).

Thus, *Brooks* lends some support to Appellee's position herein, in that *Brooks* did not connect the pre-trial deficiencies to any specific errors at trial. However, even if *Brooks* is inconsistent with *Strickland*, as posited by Chief Justice Castille, the case is nonetheless distinguishable because the pre-trial failures here are not analogous to *Brooks*, and this was not a capital case. The record establishes that Attorney Noonan met with Appellee several times in the months leading up to trial, and Attorney Walfish, who handled the actual trial, worked with Attorney Noonan.

Moreover, subsequent law from this Court has interpreted *Brooks* narrowly. *See Commonwealth v. Johnson*, 51 A.3d 237 (Pa.Super. 2012) (*en banc*) (declining "to read *Brooks* so rigidly that we are precluded from evaluating the substantive impact of the consultations [counsel] did perform."). *See id*. at 247 (Wecht, J., joined by Bowes, J., concurring) (interpreting *Brooks* to require an in-person meeting as a necessary but not sufficient component of representation, yet finding no prejudice at trial despite counsel's "dubious methods and paltry efforts at communication."). Herein, assuming that the *Brooks per se* rule extends to non-capital cases, I would find the in-person meeting requirement met by the numerous meetings between Appellee and Attorney Noonan, plus the short visit with Attorney Walfish prior to trial.

duties, which is to be analyzed under [**Strickland**], rather than as a fundamental breakdown of the adversarial process such that prejudice is presumed under **Cronic**.").

## C

### Commonwealth's argument

The Commonwealth raises nine points in support of reversal, all of which may broadly be described as asserting that Appellee's individual claims lacked arguable merit. I agree. Appellee expended significant effort at the PCRA evidentiary hearings attacking trial counsels' pre-trial failures, while largely ignoring whether those failures prejudiced him. I now examine the particular points.[7]

(i)     Failure to procure the victim's diary

Appellee faulted trial counsel for failing to obtain a diary purportedly written by the victim, which was found by Appellee's daughter M.D. after E.S. was removed from the home. Appellee concedes that the diary would not be an issue at retrial as it cannot be found. The Commonwealth states that this claim lacks arguable merit, since Appellee is required to establish that this evidence actually existed. Appellee responds by claiming the failure to

_____

[7] One of the subsidiary points pertains to the failure to secure an interpreter, an issue I have discussed at length *supra*. Since Appellee failed to explain how he was prejudiced by that error with respect to the actual trial, I do not discuss that issue further.

produce the diary at the PCRA hearing is chargeable to trial counsels' deficient pre-trial efforts. Echoing the PCRA court's analysis, he maintains that he established prejudice because trial counsel failed to implement his chosen strategy, which heavily relied upon the diary.

Appellee has never argued that the diary would undermine confidence in the verdict. In fact, he explicitly declined to do so, asserting "Whether or not this [strategy] was viable . . . they did nothing to put it into effect." Appellee's brief at 30. Thus, Appellee asserts that the diary's value is irrelevant, which would be true only if prejudice is presumed. For **Strickland** purposes, it matters a great deal whether the diary strategy was viable, which in turn depends upon what the diary says. Since we do not know, this claim lacks arguable merit.

Furthermore, I would hold that Appellee failed to demonstrate prejudice even if we were to assume that the diary said exactly what he says it did. The probative value of this evidence, Appellee tells us, is that the "diary of the complainant . . . said nothing about abuse[.]" Appellee's brief at 33. However, a child rape victim's failure to catalogue sexual abuse is unsurprising. To be sure, Appellee could have argued that the victim's failure to record these allegations undermined her credibility. But the fact that a victim of rape at the hands of her mother and step-father would not meticulously describe or even mention the incidents in a diary, hardly dictates a finding of innocence, especially when someone else could find and read the

diary, as happened in this case. As a result, Appellee has failed to establish a reasonable probability that the introduction of this diary would have changed the outcome, even charitably setting aside the fact there is nothing to substantiate what the diary said.[8]

(ii)  Failure to call Appellee's daughter, V.D.

This claim sounds in ineffectiveness for failing to call a witness, which involves several components. *See Commonwealth v. Sneed*, 45 A.3d 1096, 1108–09 (Pa. 2012). Of particular import here, the petitioner must establish that "the absence of the testimony of the witness was so prejudicial as to have denied the defendant a fair trial." *Commonwealth v. Johnson*, 966 A.2d 523, 536 (Pa. 2009). "To demonstrate *Strickland* prejudice, a petitioner 'must show how the uncalled witnesses' testimony would have been beneficial under the circumstances of the case.'" *Sneed*, *supra* at 1109 (quoting *Commonwealth v. Gibson*, 951 A.2d 1110, 1134 (Pa. 2008)).

The Commonwealth contends that Appellee failed to establish arguable merit because V.D.'s testimony at the PCRA hearing was not specific. I agree that Appellee did not establish arguable merit, as the testimony offered was

---

[8] Appellee argues that we are bound by the PCRA court's credibility determinations regarding M.D.'s testimony that she recovered the diary and sent it by Federal Express to counsel. True, but that testimony simply established that the item existed, not its contents. Additionally, as the Commonwealth notes, there are authentication issues with respect to any attempt to introduce the diary.

of little value. V.D. related at the evidentiary hearing that she did not notice anything amiss between Appellee and E.S. on the occasions that she observed them together, stating the two "got along great, like me and him would have got along." N.T., 3/31/15, at 267. This testimony was of such limited quality and value that I cannot find that its absence from trial prejudiced Appellee.

Additionally, E.S. was asked on direct examination at trial why she did not inform V.D. of the abuse.

Q. During this four-year period did you have other visitors?

A. Yeah. Well, I call her my sister, his daughter [V.D.]. She was staying with us for a while.

Q. Would these rapes happen when she was there?

A. Well, she was living with us but she was either working or a lot of times she wasn't home, so whenever she wasn't home it will happen.

Q. Why didn't you tell her?

A. Well, I didn't know how she was going to act either, because that's her father and he was always there for her, and I call her my sister, but she was the type of person that, you know, she doesn't care what the situation is, she'll just act crazy, and I was afraid of what she would do.

N.T., 2/19/08, at 68-69. On cross-examination, E.S. stated that she was scared V.D. would confront Appellee, leading Appellee to hit V.D., as he had done on a prior occasion. *Id*. at 87. Therefore, the jury was aware that the victim could have, but did not, reveal the rapes to other family members.

(iii)   Failure to call character witnesses

The presumptive prejudice theme again rears its head, as the PCRA court simply assumed that character witnesses existed, a competent attorney would have found them, and Appellee was therefore prejudiced.

> The Commonwealth contends that counsel's failure to investigate, interview or call character witnesses to corroborate the Defendant's credibility, as well as evidence of Defendant's habits was not sufficiently proven as evidence of ineffectiveness assistance of counsel. Counsel conducted no meaningful interviews with persons who could testify on the Defendant's behalf or had useful knowledge of the facts. Counsel's failure to contact potential witnesses is important in the context of a rape case where the battle of credibility before the jury comes down to the credibility between the Defendant and the victim. Evidence of good character is substantive, not mere makeweight evidence, and may, in and of itself, create a reasonable doubt of guilt and, thus, require a verdict of not guilty. **The appearance of people willing to come to court sends a signal to the jury that someone believes in the Defendant**.

PCRA Opinion II, 7/22/16, at 16 (emphasis added, citation omitted).

The PCRA court was referring to Appellee's daughters V.D., and M.D., both of whom testified at the PCRA hearing. However, they did not offer any character testimony whatsoever. Appellee's children's willingness to attend the PCRA hearing is not the same thing as offering testimony about his character, and generic testimony about a person's character is inadmissible. What is required is testimony about relevant traits, and no such testimony was offered at the PCRA hearing. Therefore, this particular claim lacked arguable merit, as determining whether the absence of the testimony was prejudicial requires an analysis of actual testimony given at the PCRA hearing. *See Johnson*, *supra* at 537 (noting that the testimony of three witnesses

"would have been consistent with and beneficial to appellee's defense, and would have contradicted the Commonwealth's theory of the case").

I also note that the PCRA court's conviction that Appellee's children would have offered helpful character testimony is severely undermined by the fact that neither witness lived in Appellee's community at the relevant times. During post-trial motions, V.D., then twenty-six, testified that she moved from Pennsylvania to Kentucky when she was thirteen or fourteen. N.T., 11/13/12, at 26. She visited Appellee every summer. M.D., then thirty-five, stated that she moved to Florida to live with her mother when she about fourteen. She lived with Appellee, M.S., and E.S. for three months in 1999 when V.D.'s daughter was an infant. *Id*. at 61. She also lived there for about eight months in 2000, when V.D. was having trouble with her daughter's father in Florida. *Id*. at 62. Thus, given that the witnesses did not live in the community, their character testimony would be of limited value. *See Commonwealth v. duPont*, 860 A.2d 525, 536 (Pa.Super. 2004) ("[W]e fail to see how the generic testimony as to duPont's reputation in his community at the time of the shooting-especially in light of the fact that two of the four witnesses in question hail from Florida and Texas, respectively-so plainly would have undermined the jury's verdict.").

(iv) Failure to investigate an alibi defense

Appellee faulted trial counsel for failing to prepare an alibi defense, which the PCRA court likewise credited, yet again based on a presumptive prejudice theory. Appellee did not establish this supposed alibi defense at the PCRA hearing, and the court wrongly assumed that proper investigation would have corroborated it.

I find that there is no arguable merit to this claim. The alibi claim in this case centers on E.S.'s trial testimony that the rapes always occurred around 6:00 p.m., while Appellee testified at trial that he worked six days a week until at least 9 p.m. N.T., 2/20/08, at 78-80. Appellee admits that he presented no evidence to corroborate this purported alibi and instead offered it as an example of deficient preparation.

> The evidence was not offered at the PCRA hearings to prove that the Defendant now has an alibi defense he can present at a new trial, but as further evidence of Walfish's lack of preparation for trial. . . . Had they learned of the Defendant's alibi when they should have, they could have sought out the evidence and witnesses they needed to prove it. In the process, they also have may have discovered witnesses who would have attested to the Defendant's character for honesty and law abiding behavior, even if the alibi did not pan out.

Appellee's brief at 42. "Absent some unexpected development, there will be no other alibi evidence at a new trial—the passage of time and succession of counsel has resulted in its loss." *Id*. at 45.

At the risk of sounding like a broken record, this analysis sounds in presumptive prejudice. How has the passage of time resulted in a loss of the defense? Appellee testified at trial that he worked for Delta Paper Company.

Appellee failed to produce employees who worked with him that could testify to his work schedule, to say nothing of employment records from the company that might show the same, as Appellee did not establish the company no longer exists. Hence, there is no arguable merit to this ineffectiveness claim.

(v)     Failure to impeach the victim with statements made by her mother

This claim involved the fact that the Commonwealth charged Appellee as a conspirator. E.S. testified that her mother, M.S., participated in these acts by requiring E.S. to have sex with Appellee. Originally, the Commonwealth intended to proceed against both M.S. and Appellee. The Commonwealth *nolle prossed* the charges after E.S. expressed a reluctance to testify against her mother.

During the investigation, the Commonwealth arranged for a recorded phone call between E.S. and M.S., in which M.S. repeatedly denied the accusations. Appellee vigorously argues that trial counsel could have impeached E.S. by introducing M.S.'s denials. The PCRA court, disturbed by the Commonwealth's decision to terminate the prosecution of mother, agreed, and faulted trial counsel for not raising this issue at trial.

> E.S. accused her mother of active participation in the rapes that occurred. She averred that her mother had struck her for refusing to consent to sexual intercourse with Petitioner and that on occasions when E.S. claimed to be menstruating, her mother would check to see if she actually was. If E.S.'s mother engaged in such conduct she deserves the same sentence for which the Defendant is serving. Such conduct is despicable if it occurred. In the phone conversations between mother and daughter overheard by police, [M.S.] repeatedly denies the conduct. Had she been

prosecuted she undoubtedly would have testified before the jury that the Defendant did not engage in the conduct charged.[9] As noted previously, she was interviewed by the police beforehand, a fact never disclosed to the jury. The effect of the nolle pros was to effectively deny Petitioner a witness's testimony crucial to his defense. **Trial counsel should have spent long hours developing a strategy to cross-examine E.S. to bring out the statements of her mother and/or should have presented a formal request to allow the admission of the tapes for reasons argued by Petitioner's current counsel.**

PCRA Opinion I, 5/12/16, at 29 (footnote and emphasis added).

The PCRA court's analysis is problematic, as it did not bother to analyze the reasonable strategic basis of any such decision.[10] Furthermore, the PCRA

---

[9] This statement is unfounded. Simply put, we do not know anything about what M.S. may or may not have testified to at trial, whether or not the co-defendants would have been jointly prosecuted, and whether M.S. would assert a Fifth Amendment privilege.

[10] The trial court granted the Commonwealth's motion *in limine* to preclude mention of the fact that the charges against M.S. were *nolle prossed*. Attorney Walfish then stated: "Clearly I understand that I cannot bring to the jury's attention the *nolle pros* of the charges against her mother, but I would hope that this would in no way limit my ability to ask the witness the role that the mother played in the events." N.T., 2/19/08, at 26-27. Thus, the actual trial transcript shows that Attorney Walfish was considering the topic of M.S.'s statements. Furthermore, at the PCRA hearing, counsel explained that he anticipated a hearsay objection from the Commonwealth if he attempted to elicit M.S.'s statements. N.T., 3/31/15, at 224.

Finally, with respect to this issue, Attorney Walfish stated that E.S.'s testimony that M.S. was an active participant **helped** his case, because it supported the notion that the victim's story was absurd. Indeed, he confirmed on cross-examination of the reporting detective that E.S. implicated M.S., which demonstrates that counsel did not wish to undercut that point. N.T., 2/20/08, at 35. That is a perfectly acceptable strategy, which the PCRA court did not

court declined to address whether the actual ineffectiveness claim—that

Attorney Walfish should have impeached the victim at trial—was legally viable,

a fact the court candidly admits.

> The mother's recorded statements to her daughter, the alleged victim, was a potentially powerful piece of evidence, favorable to the Defendant, ignored and whimsically dismissed by the Defendant's trial counsel. **It is unclear whether those statements were un-categorically inadmissible**. **The undersigned has ordered a new trial. The undersigned does not want to assist the defense in constructing a way to use this piece of evidence**. Different Judges and different attorneys may have varying opinions on how this evidence could have been used. In point of fact, this evidence was ignored by defense counsel.

PCRA Opinion II, 7/22/16, at 17 (emphasis added).

The PCRA court's unwillingness to provide a roadmap for Appellee to

introduce this evidence at his new trial, or assess whether the evidence would

have made any difference whatsoever, would be laudable but for the fact

Appellee was required to establish those very points under ***Strickland*** in order

to receive a retrial in the first place.

Since the PCRA court failed to analyze the admissibility of this evidence,

I would hold that Appellee's claim lacked arguable merit for several reasons.

First, the declarant in question is M.S., the alleged co-conspirator, whose

_____

analyze.  We could dispose of the hearsay statement issues on this basis as well.

statements were introduced through the victim E.S. Therefore, it is inaccurate to refer to M.S.'s denials as impeaching E.S. M.S.'s denial of criminal culpability when confronted by E.S. does not discredit E.S.[11]

Furthermore, the out-of-court statements of M.S. were admissible pursuant to a codified exception to the prohibition against hearsay. Appellee argued to the PCRA court that the same exception applied to him; however, the exception does not permit Appellee to introduce co-conspirator statements. Pennsylvania Rule of Evidence 803 states in relevant part:

> **(25) An Opposing Party's Statement.** The statement is offered **against** an opposing party and:
> . . .
>
> (E) was made by the party's coconspirator during and in furtherance of the conspiracy.

Pa.R.E. 803(25)(E) (emphasis added). The emphasized language plainly indicates that a limitation of the co-conspirator hearsay exception is that it applies only if the evidence is offered against the accused. It does not apply when a co-conspirator is seeking to use a participant's statement to his benefit. Finally, Appellee fails to explain how a statement denying culpability is in furtherance of a conspiracy. Therefore, this ineffectiveness claim lacked arguable merit.

---

[11] The recorded statements would impeach E.S. had E.S. denied confronting her mother, but in that situation it would be **her** statements to M.S. on the tape that impeach E.S., not the denials by M.S.

(vi)   Failure to record the preliminary hearing testimony

This claim is much like the others, as the PCRA court finds prejudice due to poor pre-trial planning.

> Counsel's discredited testimony on the reason why he did not have a stenographer record the victim's testimony or take any notes of testimony himself was that he "already had his theory of the case." Assuming Counsel's theory to the case was actually his theory of the case Counsel's stated reason for not recording the testimony is preposterous. A record of a victim's testimony before trial is essential evidence.  The victim's testimony was exactly the focal item that Counsel's "theory" was meant to rebut.  The failure to record the testimony to study and dissect it for trial preparation was illogical and did not have a reasonable basis.

PCRA Opinion II, 7/22/16, at 18.

I take no issue with the criticism of the failure to have a reporter present for the preliminary hearing.  However, that failure simply means that we must proceed to examine whether Appellee was prejudiced by that failure.  The PCRA court again erroneously assumed that deficient pre-trial preparation prejudiced Appellee, which is a *Cronic* analysis.

**D**

Cumulative prejudice does not apply

The PCRA court ultimately concluded that a new trial was warranted on the grounds of cumulative prejudice, due to the aggregation of the multiple pre-trial failures to investigate.  "When the failure of individual claims is grounded in lack of prejudice, then **the cumulative prejudice from those individual claims may properly be assessed.**"  PCRA Opinion II, 7/22/16,

- 35 -

at 13 (citations omitted, emphasis in original). However, the PCRA court found prejudice due to pre-trial failures not grounded in actual prejudice. *See e.g. id*. at 16, n.7 ("It is reasonable to conclude that if coworkers would have been contacted early on they might well have been ready and willing to provide testimony that Defendant regularly worked long hours and was generally at work at the time of the alleged rapes."). These sorts of hypotheticals, liberally strewn throughout the PCRA court's rulings, are incompatible with **Strickland**. The cumulative prejudice doctrine requires actual prejudice; the doctrine is designed to permit a new trial where any single instance of prejudice does not undermine confidence in the verdict. Hence, claims that lack arguable merit cannot establish cumulative prejudice.

Finally, the PCRA court extensively quoted **Commonwealth v. Perry**, 644 A.2d 705 (Pa. 1994), in reaching its conclusion. **Perry** was a capital case, and the defense attorney testified that he was unaware the Commonwealth was seeking the death penalty until four days before jury selection. **Id**. at 708. The Court applied **Strickland** as follows.

> Applying this standard to counsel's representation in this case leads inexorably to the conclusion that trial counsel was constitutionally ineffective and that appellant must be granted a new trial. There is no question that appellant's underlying allegations of ineffectiveness-failure to interview appellant prior to trial, failure to prepare for trial, failure to use his investigator, unawareness that he was defending a capital case, and failure to prepare for the death penalty hearing-have merit. Counsel's failure to interview witnesses was ineffective, arguably *per se*.

The second prong of establishing ineffectiveness of counsel-whether counsel had a reasonable basis for his performance-requires little reflection and scant discussion. It is not even arguable that counsel's failure to utilize his investigator for nine months until the eve of trial could have had any reasonable basis designed to effectuate his client's interest. The other allegations of ineffectiveness, fitting broadly under the rubric of failure to prepare for trial, are not even arguably reasonable tactics serving some broad strategic plan for the defense. Failure to prepare is not an example of forgoing one possible avenue to pursue another approach; it is simply an abdication of the minimum performance required of defense counsel. It is not possible to provide a reasonable justification for appearing in front of a death penalty jury without thorough preparation.

*Id*. at 709 (citations omitted). *Perry* thus granted a new trial, although it did not detail how the pre-trial failures undermined confidence in the reliability of the verdict. However, the Court did discuss prejudice, albeit in a limited fashion:

This is a case in which the evidence might have supported a lesser degree of homicide than first degree murder; it is also a case in which a death penalty jury might have rendered a verdict of life imprisonment if appellant's counsel had presented character witnesses and other mitigating factors such as appellant's National Guard service, adult educational endeavors, and employment history. It therefore seems quite clear that the result of the trial might have been different were it not for counsel's errors.

*Id*. at 709.

I find that *Perry* is distinguishable.[12]  Appellee's attempts to establish prejudice were based solely on sheer speculation; he points to nothing specific

---

[12] *Perry* did not cite *Cronic* nor discuss presumptive prejudice.  *Perry*, while purporting to find prejudice under *Strickland*, is perhaps better understood

_____

as applying **Cronic** on the grounds that counsel therein failed to meaningfully subject the prosecution's case to adversarial testing. The fact that an attorney was unaware that his client was facing the death penalty is a remarkably egregious failure, leading the Court to conclude without belaboring the point that the attorney was utterly unprepared to probe the Commonwealth's case. Therefore, I submit that **Perry** actually found presumptive prejudice, not **Strickland** prejudice, due to that failure. **See Phillips v. White**, 851 F.3d 567, 581 (6th Cir. 2017) (finding **Cronic** prejudice attached to performance at death penalty hearing because attorney's "performance amounted to nonperformance; he essentially ceded the sentencing to the Commonwealth").

Nevertheless, in light of language in **Perry** and **Brooks** suggesting that a petitioner need not particularly reference the actual trial to establish **Strickland** prejudice, this case may represent an appropriate vehicle for our Supreme Court to take up the difficult issue of whether, and when, a court may find presumptive prejudice due to pre-trial failures to investigate and prepare, and whether such presumptions attach only to the reasonable strategic basis prong as opposed to the prejudice prong. **See Commonwealth v. Williams**, 141 A.3d 440, 460, n.18 (Pa. 2016) (assessing prejudice in light of expert testimony presented at PCRA hearing but not foreclosing possibility that, in circumstances of the particular case, a pre-trial failure to consult with experts in field of forensic pathology and blood flow may be deficient). **Compare Harrington v. Richter**, 562 U.S. 86 (2011) (finding that state court did not unreasonably apply **Strickland** in holding that defense counsel's failure to consult with expert witnesses prior to trial was not itself deficient under circumstances of the particular case); **Id**. at 113 (Ginsburg, J., concurring in judgment) (concluding that counsel "was not functioning" as counsel for purposes of the Sixth Amendment due to failure to consult blood expert in preparation of murder trial, yet finding no prejudice under **Strickland** with respect to reliability of verdict); **Weaver**, **supra** at 1916 ("Weaver's theory conflicts with **Strickland** because it implies that an attorney's error can be prejudicial even if it 'had no effect,' or only 'some conceivable effect,' on the outcome of his trial. That is precisely what **Strickland** rules out.") (Alito, J., joined by Gorsuch, J., concurring) (citation omitted).

For my part, I am highly skeptical that a new trial may be granted solely on a theory of presumptive prejudice flowing from pre-trial deficiencies without reference to the actual trial. **Cronic** prejudice is warranted, if at all, only in

_____

such rare, egregious situations where counsel failed to fulfill the basic adversarial role contemplated by the Sixth Amendment. Such failures, however, must be complete, and would be obvious from an examination of the trial record. ***Perry***, ***supra*** at 708 (describing counsel's performance at the penalty hearing as "present[ing] a travesty of a case at the death penalty hearing"). The completeness of that failure is required. ***See Bell v. Cone***, 535 U.S. 685, 696–97 (2002) ("When we spoke in ***Cronic*** of the possibility of presuming prejudice based on an attorney's failure to test the prosecutor's case, we indicated that the attorney's failure must be complete."). This case simply does not meet that high standard.

As demonstrated by ***Bell***, the United States Supreme Court has consistently indicated that presumptive prejudice is reserved for a narrow class of cases, and ***Weaver***, ***supra***, which refused to automatically find prejudice even in cases of structural error when that issue was not pursued on direct appeal, further underscores that point. We apply federal precedent to the prejudice inquiry. ***Commonwealth v. Kimball***, 724 A.2d 326 (Pa. 1999). I believe the Court of Appeals for the Seventh Circuit correctly sets forth the law regarding failures to prepare:

> Patrasso argues that the magnitude of Muldowney's multiple failures indicate that this case is more appropriately evaluated under ***Cronic*** and that therefore he does not have to show prejudice. We have held, however, that where ineffectiveness is due to the attorney's lack of preparation or skill—the type of allegations involved in this case—***Strickland*** rather than ***Cronic*** applies. Patrasso had an attorney and the attorney did take some action on his behalf (at least during the guilt phase—the sentencing phase will be discussed separately below). Thus, Patrasso must meet the dual-pronged ***Strickland*** standard to establish he was denied the effective assistance of counsel during his trial.

***Patrasso v. Nelson***, 121 F.3d 297, 302 (7th Cir. 1997) (citation omitted). In the absence of a complete failure to subject the prosecution's case to meaningful testing, I view failure to investigate claims as confined to the reasonable strategic basis prong. If an attorney unreasonably failed to pursue a particular avenue under the circumstances of a case, then a court must turn to the prejudice inquiry. ***Harrington***, ***supra***.

that would have changed the outcome at trial, whereas **Perry** does. Thus, **Perry** does not hold that the mere failure to prepare alone, without a consequent showing of how those failures undermine confidence in the verdict, constitutes **Strickland** prejudice. Indeed, such a holding would seem to conflict with the United States Supreme Court. **See Brooks**, **supra** at 252, n.6 ("[I]f **Perry** stood for the proposition that the **Strickland/Pierce** rubric permits a conclusion of ineffectiveness without a showing of actual prejudice, *i.e.,* that the outcome of the proceeding would have been different but for counsel's ineffectiveness, it would be mistaken.") (Castille, C.J., concurring).

In contrast to **Perry**, this case was a factually straightforward sexual abuse case, which boiled down to a jury's assessment of the credibility of E.S., who claimed that Appellee raped her over a period of years, versus the credibility of Appellee, who testified in his defense and denied the allegations. This was not a case involving complex scientific matters or other witnesses to the crimes in question, where one might reasonably expect defense counsel to investigate multiple avenues of defense. Allegations of sexual abuse by a family member occurring over a long period are, by their nature, conducted at home away from prying eyes and difficult to disprove.

Unlike the attorney in **Perry**, trial counsel herein performed the core task demanded by the Sixth Amendment: he subjected the prosecution's case to adversarial testing. He cross-examined the victim regarding inconsistencies between her testimony and what she told the police when the rapes were first

reported. He suggested that she was angry with Appellee because he was too strict, giving her a motivation to lie. He cross-examined her about V.D.'s visits to their residence and why she did not reveal the allegations to her step-sister, and cross-examined the Commonwealth's other witnesses.

Additionally, counsel delivered a lengthy closing argument, which occupies thirty-five single-spaced pages of transcript, attacking the victim's story. He estimated that, by E.S.'s account, she was raped approximately 450 times and did not tell anyone for years, suggesting that her entire story was wholly unbelievable. He further attacked her testimony that the rapes simply started one day without any type of grooming behavior. "You're being told that [the rapes] happened out of the blue. No provocation, no justification, no enticement, no explanation. Boom. It happened. And you have to ask yourself does this make sense[?]" N.T., 2/20/08, at 114. He argued that a fight with her parents prompted E.S.'s complaint at school, and argued that E.S.'s statements regarding her own mother's involvement were absurd. "This is her flesh and blood and she was smirking about her child, her daughter, who is living in the house, being raped." *Id*. at 117. He continued:

> Now this is getting into fiction. I mean, really. Ladies and gentlemen, you need to just step back, take a deep breath and say does that work for me? Does that fit the facts? Can it possibly be what these people were doing? Can it? And nobody ever found out?

*Id*. at 123.

I find that trial counsel meaningfully opposed the prosecution's case and fulfilled the Sixth Amendment guarantee of effective representation. Indeed, the PCRA court apparently thought that counsel performed adequately at trial. "[E.S.] was cross-examined by a seasoned skilled defense attorney, who despite his lack of proper preparation and planning, as far as a total defense, undoubtedly made her trial experience very unpleasant." PCRA Opinion I, 5/12/16, at 42. Therefore, I cannot find that the pre-trial lapses rose to the extreme level of a breakdown in the adversarial process resulting in conclusive prejudice, even assuming such a theory is viable in the absence of a complete failure to test the prosecution's case.

The jury found that E.S.'s story was credible despite the points argued by Appellee's counsel. Tellingly, Appellee does not claim that counsel's performance at the actual trial, despite the numerous allegations of poor pre-trial preparation, prejudiced him in any way. The PCRA court unjustifiably assumed that better efforts may have turned up something favorable, without requiring Appellee to establish what those things may have been. Empty allegations and discomfort with the level of preparation do not establish **Strickland** prejudice. I would therefore reverse the grant of a new trial.