J-S54011-20

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| SHAWN N. MCCOY | : | |
| | : | |
| Appellant | : | No. 721 MDA 2020 |

Appeal from the PCRA Order Entered May 7, 2020
In the Court of Common Pleas of Dauphin County Criminal Division at
No(s): CP-22-CR-0003462-2015


BEFORE:    NICHOLS, J., McLAUGHLIN, J., and MUSMANNO, J.

MEMORANDUM BY NICHOLS, J.:                    **FILED APRIL 26, 2021**

Appellant Shawn N. McCoy appeals from the order denying his timely first Post Conviction Relief Act[1] (PCRA) petition.  Appellant contends trial counsel was ineffective for failing to request a *crimen falsi*[2] jury instruction concerning Sharayne Cook, a Commonwealth witness who had prior convictions for retail theft and robbery.  We affirm.

The PCRA court summarized the facts of this matter as follows:

Officer Angel Diaz of the Harrisburg Police Department, testified that he received a radio call related to a robbery in the 200 block of Verbeke Street, Harrisburg, on April 8, 2015. It was during his 11:00 p.m. to 7:00 a.m. shift.  He encountered a white Hyundai

---

[1] 42 Pa.C.S. §§ 9541-9546.

[2] *Crimen Falsi* is defined as an "offense which involves some element of deceitfulness, untruthfulness, or falsification bearing on witness' propensity to testify truthfully."  **Commonwealth v. Mehalic**, 555 A.2d 173, 183 (Pa. Super. 1989) (quoting Black's Law Dictionary 335 (5th ed. 1979)).

Elantra, the suspected vehicle, and activated his emergency lights. Officer Diaz took chase behind the vehicle, while traveling on North 6th Street. After turning onto North 5th Street, Officer Diaz observed a light-skinned black male hang out of the passenger side window of the Hyundai and point a gun at [the police] vehicle. Officer Diaz received fire; he heard rounds "whizzing" past him as he was driving behind the suspect vehicle. The officer slowed his vehicle and could still hear shots being fired. As he proceeded to North Front Street, he was advised by another officer over radio that the suspect vehicle either stopped or crashed. Officer Diaz was then advised by another officer that the suspects were on foot. Two of the suspects were then approached at gunpoint and taken into custody. One was a black female, Sharayne Cook, and the other was a dark-skinned black male, Yusef Blake. Officer Diaz realized that his car was not operable after he placed the female suspect into custody and placed her in the back of the vehicle. He realized that there was a long stream of transmission fluid seeping onto the roadway. The entire police chase was caught on dash cam and played for the jury. When asked if he got a good look at the person who was shooting in terms of their skin tone, Officer Diaz stated that the skin tone of the shooter was much lighter than the male they had brought into custody, Yusef Blake.

Autumn Sloane, former girlfriend of [Appellant], testified regarding the firearm that she purchased on [Appellant's] behalf. Ms. Sloane testified that she and [Appellant] were together frequently as a couple, and stated that he egged her on to purchase a gun. [Appellant] supplied Ms. Sloane money for the gun, a .40-caliber Taurus, to purchase at Bass Pro Shop. The two of them went to the store together, [Appellant] picked out the gun he wanted, took a picture of it with Ms. Sloane's cell phone, and Ms. Sloane purchased it at the counter. Ms. Sloane testified that [Appellant] had taken the gun from her apartment at 6175 Hooker Road (Apt. F) and the police eventually found the gun case at Ms. Sloane's home, after the crimes were committed. [Appellant's] fingerprint was later found on the gun case. Photos of the gun were admitted into evidence. Another admitted photo depicted [Appellant] with the pistol tucked in his waistband. [Appellant] is wearing a t-shirt in the photo, and Ms. Sloane was asked about the tattoo that was visible on his neck. When asked what kind of tattoo it was, Ms. Sloane replied "a 500." Ms. Sloane also testified that [Appellant] went by the nickname "Shizz." Ms. Sloane made

contact with [Appellant] to assist in his apprehension and encouraged him to turn himself in.

Sharayne Cook, who was charged as [Appellant's] co-defendant, also testified. At the time of trial, Ms. Cook was incarcerated at Dauphin County Prison. Ms. Cook and [Appellant] had been romantically involved. Ms. Cook testified that on April 7th into April 8th, 2015, she and [Appellant] went to Shady McGrady's bar. [Appellant] drove a white Hyundai and Ms. Cook was the passenger that evening. They stopped at a gas station before going to Shady McGrady's, where they purchased a bottle of fruit punch and bottle of ginger ale. The police later found both bottles in the car, and subsequent testing indicated that [Appellant's] DNA was found on both bottles. A video surveillance camera tape from Shady McGrady's was played for the jury. Ms. Cook identified herself, [Appellant,] and Yusef Blake in the video. They left the bar at closing time, and Ms. Cook got into the driver's seat of the white Hyundai and started the car. [Appellant] and Mr. Blake joined her in the car and, shortly thereafter, two men[, who were later identified as Jamie Jones and Duane Dunlap,] walked by heading towards Third Street. [Appellant] and Mr. Blake got out of the car and walked in the direction of the two men. Mr. Blake returned to the car a short time later and then circled back to get [Appellant]. Ms. Cook made a U-turn and [Appellant] got into the passenger seat and Mr. Blake got into the back of the car behind the driver's seat. While on Sixth Street, Ms. Cook came into contact with a police car. The officer activated the lights and attempted to have Ms. Cook pull over; instead, she testified that she took him on a high-speed chase. Ms. Cook testified that [Appellant] was yelling at her at this point, saying "don't fucking pull over, just go[.]" When asked if someone started shooting at some point, Ms. Cook testified that [Appellant] started to shoot out [of] the car window. She stated that he shot two times while they were on Sixth Street, and another two times when the car was in an alleyway near Italian Lake. Ms. Cook attested that Mr. Blake did not fire any shots. During direct examination, the Commonwealth elicited Ms. Cook's two prior convictions for retail theft [and one count of robbery as a co-defendant in Appellant's case. N.T., 6/22/16, at 139].

Jamie Jones testified at trial that he and his friend Duane Dunlap were at Shady McGrady's on April 7th/8th, 2015 and left at closing time. As they were walking from the bar, Mr. Jones stated that they heard a female voice say, "hey, I like your outfit." The voice came from the window of a Galant-type car. After the woman

spoke, Mr. Jones observed a man get out of the car, and Mr. Jones sensed trouble and start[ed] running. He heard his friend Duane say, "my earrings too, bro?" Mr. Jones circled back around and yelled. A second man drew a gun and Mr. Jones took off again. He testified that both of the men had guns. They both chased Mr. Jones, who was smacked in the back of the head twice with something hard. Mr. Jones presumed it was a gun. When he hit the ground, one of the men smacked him across the mouth. The assailant took Mr. Jones' watch, cell phone, hat, jacket, money, and a bag of marijuana. When asked if he noticed any tattoos or body markings on the man who struck him, Mr. Jones answered that he noticed a piece of a tattoo on his neck. When asked about any names that were exchanged between the two men, Mr. Jones replied that he heard one of them say to the other, "let's go, Shizz," or "hurry up, Shizz."

In a recorded statement with police the next day, Mr. Jones told the officers that he was 100 percent sure that the person who robbed him was [Appellant]. At the preliminary hearing, however, Mr. Jones did not identify [Appellant]. After the hearing, Mr. Jones spoke with a detective and Jennifer Hartlep from the District Attorney's Office. They asked about the disparity between the statement and the hearing testimony and Mr. Jones admitted that had heard there were several prices on his head.

Jennifer Hartlep, who was the original prosecutor in [Appellant's] case,[3] also testified at trial. She said she met Mr. Jones at the preliminary hearing in this matter in June of 2015. When Ms. Hartlep asked Mr. Jones if he could identify the person who robbed him, Mr. Jones replied, "I don't know." Prior to the hearing, Ms. Hartlep had spoken to Mr. Jones about whether he could identify his assailant. Specifically, Ms. Hartlep testified, "I asked him if he recognized the picture that he saw on the news before [Appellant] was arrested, if he recognized that person as, in fact, the person that robbed him, and he said yes. One hundred percent." Mr. Jones also told Ms. Hartlep that he was able to see a large tattoo definitely across the front of the person's neck. When Ms. Hartlep confronted Mr. Jones after the preliminary hearing, she asked him what happened. His response was, "you wouldn't understand, there are threats on my life."

---

[3] Appellant's first trial ended in a mistrial on April 21, 2016.

> Duane Dunlap was with Jamie Jones on the evening in question, and was the second victim of the robberies. Mr. Dunlap testified that two gentlemen jumped out of a Hyundai as he passed by with Mr. Jones. They had just left Shady McGrady's bar. One of the assailants went after Mr. Jones while the other approached Mr. Dunlap. Mr. Dunlap described the man as a dark-skinned with a hoodie. He put the gun to Mr. Dunlap's chest and robbed him, taking his earrings, watch, chain, money, ID, and bank card. Mr. Dunlap did not get a good look at the person who chased after Mr. Jones.

PCRA Ct. Op., 5/7/20, at 2-3, n.2 (record citations omitted and some formatting altered).

A jury found Appellant guilty of two counts of robbery, and one count each of assault of a law enforcement officer, criminal conspiracy, carrying firearm without a license, and escape.[4] On September 7, 2016, the trial court sentenced Appellant to an aggregate term of twenty-eight to sixty years of imprisonment. Appellant filed post-sentence motions, which the trial court denied, and Appellant filed a notice of appeal. In our disposition of Appellant's direct appeal, we vacated the conviction for escape, affirmed the remaining convictions, and remanded for resentencing. *Commonwealth v. McCoy*, 1713 MDA 2016, 2017 WL 4711964 (Pa. Super. filed Oct. 19, 2017) (unpublished mem.).

On May 4, 2018, Appellant filed a *pro se* PCRA petition that the PCRA court held in abeyance until after resentencing. On September 17, 2018, the trial court resentenced Appellant to an aggregate term of twenty-seven and

---

[4] 18 Pa.C.S. §§ 3701(a)(1)(ii), 2702.1(a)(2), 903(a), 6106, and 5121, respectively.

one-half to fifty-seven years of imprisonment and permitted Appellant's counsel to withdraw. On October 3, 2018, Appellant filed a *pro se* motion to renew his May 4, 2018 PCRA petition. The PCRA court ultimately appointed counsel to represent Appellant in the litigation of his PCRA petition on November 19, 2018, and on February 1, 2019, Appellant, through counsel, filed a timely PCRA petition in which he alleged that trial counsel was ineffective.[5] On May 7, 2020, the PCRA court denied Appellant's PCRA petition

_____

[5] The *pro se* May 4, 2018 PCRA petition was premature when filed, and the PCRA court should have dismissed it instead of holding the petition in abeyance. *See **Commonwealth v. Seay***, 814 A.2d 1240, 1241 (Pa. Super. 2003) (holding that the PCRA cannot be invoked until judgment of sentence is final). However, Appellant's May 4, 2018 *pro se* PCRA petition may be considered a nullity as he remained represented by counsel. ***See Commonwealth v. Mojica***, 242 A.3d 949, 953 (Pa. Super. 2020) (stating that hybrid representation is not permitted, and generally, documents are legal nullities when they are filed by *pro se* litigants who are represented by counsel). Appellant's trial counsel was not permitted to withdraw until September 17, 2018, after Appellant was resentenced. Because the PCRA court erroneously opted to hold the matter in abeyance, and the docket does not reflect that Appellant's *pro se* PCRA petition was forwarded to counsel pursuant to Pa.R.Crim.P. 576(A)(4), we conclude that it would be unjust to now dismiss the instant PCRA petition as a nullity. ***Mojica***, 242 A.3d at 953. However, we note that Appellant's October 3, 2018 motion to renew his PCRA petition was also premature, because the amended judgment of sentence was not final for purposes of the PCRA until October 17, 2018, thirty days after the trial court resentenced Appellant, when the time for filing a direct appeal expired. 42 Pa.C.S. § 9545(b)(3). Yet, as referenced above, the October 3, 2018 motion sought to renew a null filing, and a filing of which counsel was not properly informed. More significantly, Appellant had a right to counsel on his first PCRA petition. *See **Commonwealth v. Robinson***, 970 A.2d 455 (Pa. Super. 2009) (*en banc*) (discussing the rule-based right to counsel on a first PCRA petition). The PCRA provides that a petitioner has one year from the date judgment of sentence becomes final in which to file a timely PCRA petition. 42 Pa.C.S. § 9545(b)(1)(ii). Despite the missteps in Appellant's

without a hearing. Appellant filed a timely notice of appeal, and both the PCRA

court and Appellant complied with Pa.R.A.P. 1925.

On appeal, Appellant raises one issue:

1. Did the PCRA court err when it held that [Appellant] was not entitled to relief for ineffective assistance of counsel, when trial counsel failed to request a jury instruction regarding the *crimen falsi* convictions of a witness.

Appellant's Brief at 4 (some capitalization omitted).

Appellant contends that trial counsel was ineffective for failing to request

a *crimen falsi* jury instruction because one of the Commonwealth's witnesses,

Ms. Cook, had prior convictions for retail theft and robbery. Appellant's Brief

at 11-12. Appellant relies on **Commonwealth v. Cole**, 227 A.3d 336 (Pa.

Super. 2020), in support of his argument on appeal. *Id.* at 15.

Our standard and scope of review are as follows:

When reviewing the propriety of an order pertaining to PCRA relief, we consider the record in the light most favorable to the prevailing party at the PCRA level. This Court is limited to determining whether the evidence of record supports the conclusions of the PCRA court and whether the ruling is free of legal error. We grant great deference to the PCRA court's findings that are supported in the record and will not disturb them unless they have no support in the certified record. However, we afford no such deference to the post-conviction court's legal conclusions. We thus apply a *de novo* standard of review to the PCRA [c]ourt's legal conclusions.

---

premature *pro se* filings and the PCRA court holding the PCRA petition in abeyance, the PCRA court ultimately appointed counsel to represent Appellant. Counsel filed a timely PCRA petition on February 1, 2019, within one year from the date that Appellant's judgment of sentence became final. Accordingly, we discern no jurisdictional impediment to our review.

*Commonwealth v. Diaz*, 183 A.3d 417, 421 (Pa. Super. 2018) (citations and quotation marks omitted). Additionally, "we may affirm the decision of the [PCRA] court if there is any basis on the record to support the [PCRA] court's action; this is so even if we rely on a different basis in our decision to affirm." *Commonwealth v. Wiley*, 966 A.2d 1153, 1157 (Pa. Super. 2009) (citation omitted).

> "With respect to claims of ineffective assistance of counsel, counsel is presumed to be effective, and the petitioner bears the burden of proving to the contrary." *Commonwealth v. Brown*, 196 A.3d 130, 150 (Pa. 2018) (citation omitted). Moreover,
>
> > [A] PCRA petitioner will be granted relief only when he proves, by a preponderance of the evidence, that his conviction or sentence resulted from the ineffective assistance of counsel which, in the circumstances of the particular case, so undermined the truth-determining process that no reliable adjudication of guilt or innocence could have taken place.

*Commonwealth v. Spotz*, 84 A.3d 294, 311 (Pa. 2014) (some citations omitted).

To obtain relief based on a claim of ineffective assistance of counsel, a PCRA petitioner must establish: (1) the underlying claim is of arguable merit; (2) there was no reasonable basis for counsel's action or failure to act; and (3) a prejudice to the petitioner; *i.e.*, but for counsel's error, there is a "reasonable probability the result of the proceeding would have been different." *Commonwealth v. Treiber*, 121 A.3d 435, 444 (Pa. 2015). "If a petitioner fails to prove any of these prongs, his claim fails." *Spotz*, 84 A.3d at 311 (citation omitted). Therefore, when a petitioner has failed to meet the

prejudice prong, the claim may be disposed of on that basis alone, without a determination of whether the first two prongs have been met. **Commonwealth v. Baker**, 880 A.2d 654, 656 (Pa. Super. 2005).

In **Cole**, another panel of this Court addressed a scenario wherein the appellant's counsel did not request a jury instruction on *crimen falsi*, despite a Commonwealth witness having prior conviction for retail theft. **Cole**, 227 A.3d at 339-340. In that case, the PCRA court concluded that the appellant was not prejudiced by the lack of a *crimen falsi* jury instruction because the trial court provided a jury instruction concerning witness credibility. **Cole**, 227 A.3d at 342. Additionally, the PCRA court explained that the appellant was not prejudiced because the trial court explained *crimen falsi* to the jury. **Id**.

On appellate review, the **Cole** Court disagreed with the PCRA court and concluded the trial court's general instruction regarding witness credibility was not sufficient to inform the jury concerning the issue of *crimen falsi*. **Id**. (citing **Commonwealth v. LaMassa**, 532 A.2d 450, 452 (Pa. Super. 1987) (explaining that the trial court's general instruction on witness credibility was not sufficient to inform the jury regarding the use it could make of prior *crimen falsi* convictions, and the trial court erred when it refused to provide an instruction on *crimen falsi*)). Moreover, the **Cole** Court found that there was no support in the record for the PCRA court's conclusion that the trial court explained *crimen falsi* when the witness testified. **Id.** This Court stated:

> The only statement to which the court could be referring was a ruling on defense counsel's objection to the Commonwealth's asking Ms. Hayden why she was "doing these retail thefts." N.T. Trial, 3/19/13, at 45. In overruling the objection, the court remarked, "It's fair background for the witness's credibility." *Id.* The court did not explain, in this statement, the relevancy of Ms. Hayden's *crimen falsi* offenses, nor instruct the jury on how that evidence could be considered in assessing her credibility.

*Cole*, 227 A.3d at 342-343 (internal brackets omitted). After review, the *Cole* Court found that there was arguable merit to the appellant's claim, counsel had no reasonable basis for failing to request the jury instruction, and the appellant established prejudice. *Id.* at 343. Accordingly, this Court reversed the PCRA court's order, vacated the judgement of sentence, and remanded for a new trial. *Id.*

Here, the PCRA court distinguished *Cole* from the case at bar. PCRA Ct. Op., 5/7/20, at 7-9. The PCRA court explained that in *Cole*, the witness with prior *crimen falsi* convictions, was crucial to the prosecution and no other Commonwealth witness was able to offer testimony that could establish the elements of first-degree murder. *Id.* at 9 (citing *Cole*, 227 A.3d at 341). The PCRA court concluded that in the instant case, Ms. Cook's history of dishonesty was evident to the jury and her testimony was not crucial to the prosecution. The PCRA court explained:

> As set forth previously, Ms. Cook's testimony was not crucial in the Commonwealth's case against [Appellant], as there was more than sufficient additional evidence to convict him. Unlike the witness in *Cole*, Ms. Cook certainly was not vital in the sense that her testimony was needed to establish something akin to premeditation for first-degree murder. Again, Ms. Cook's inconsistent statements and wavering versions of the facts had already been played out for the jury; her propensity for dishonesty

- 10 -

had been established. Unlike **Cole**, it cannot be said here that [Appellant] was prejudiced by counsel's conduct.

PCRA Ct. Op., 5/7/20, at 9. The record supports the PCRA court's findings and conclusions.

During the Commonwealth's direct examination of Ms. Cook, the Commonwealth asked her about her history of *crimen falsi*. N.T., 6/22/16, at 138-139. The Commonwealth discussed the present charges against Ms. Cook for her role as Appellant's co-defendant and asked about her prior convictions for conspiracy to commit retail theft, and two counts of retail theft. **Id.** at 139. The Commonwealth questioned Ms. Cook about her agreement to cooperate with the prosecution and that for her part in Appellant's criminal acts, she would receive a sentence of two to four years of incarceration. **Id.** at 139-140.

On cross-examination, Appellant's counsel asked Ms. Cook about her role as a co-conspirator in the crimes with which Appellant was charged in addition to Ms. Cook's prior convictions. N.T., 6/23/16, at 33-35. Appellant's counsel noted that Ms. Cook's prior convictions included retail theft, and counsel inquired about Ms. Cook's status as a probationer. Counsel stressed that Ms. Cook entered into an agreement with the Commonwealth to testify against Appellant and received a sentence of only two to four years of incarceration followed by eighteen months of probation. **Id.** Appellant's counsel focused on the agreement and emphasized that it was a good deal for Ms. Cook. **Id.** at 35. In closing, Appellant's counsel highlighted Ms. Cook's

prior crimes and her agreement with the Commonwealth. N.T., Closing, 6/24/19, at 13.

Importantly, we agree with the PCRA court that the instant case is distinguishable from *Cole* because Ms. Cook's testimony was not crucial to the prosecution. Specifically, the record supports the PCRA court's finding that Appellant could not establish prejudice because there was overwhelming evidence of his guilt other than Ms. Cook's testimony. PCRA Ct. Op., 5/7/20, at 14. As referenced above, the record reveals that Police Officer Angel Diaz testified that while on duty on April 8, 2015, he received a radio call related to a robbery, and in response he encountered a white Hyundai. N.T., 6/21/16, at 34-37. Officer Diaz followed the white Hyundai and activated his emergency lights and pursued the vehicle. *Id.* at 39. During the pursuit, Officer Diaz observed an individual, whom he described as a light-skinned black male wearing a dark top, emerge from the passenger-side window of the white Hyundai firing a handgun. *Id.* at 42. The officer testified that the gunshots struck his police vehicle. *Id.* at 43. Officer Diaz stated that when the white Hyundai stopped, the occupants fled on foot, and Officer Diaz and another officer arrested two occupants, Ms. Cook and Mr. Blake. Officer Diaz testified that Mr. Blake had a darker complexion than the man who was shooting out the window of the white Hyundai. *Id.* at 47.

Additionally, Ut Dihn, a forensic DNA scientist for the Pennsylvania State Police testified that Appellant's DNA was found on two bottles recovered from inside the white Hyundai. N.T., 6/22/16, at 120-122. Autumn Sloane,

testified that she purchased a handgun for Appellant. N.T., 6/22/16, at 68. Ms. Sloane also testified that Appellant had a neck tattoo and went by the nickname "Shizz." *Id.* at 74-77. Jamie Jones testified, that when he was robbed, one of the perpetrators had a neck tattoo and that he heard one of the men say to the other "let's go, Shizz," or "hurry up, Shizz." N.T., 6/21/16, at 100-106.

Pursuant to our standard of review, we must consider the evidence in the light most favorable to the Commonwealth. *See Diaz*, 183 A.3d at 421. Exclusive of Ms. Cook, the witnesses explained that Appellant had access to and possessed a handgun and identified Appellant with the nickname "Shizz." The testimony also established that Appellant robbed Mr. Jones and Mr. Dunlap, and the DNA evidence supported the conclusion that Appellant was inside the vehicle. Finally, the testimony established that Appellant was in the passenger seat of the white Hyundai as it fled from the robbery, and Appellant was the man who repeatedly fired his weapon at Officer Diaz during the pursuit. Accordingly, we agree with the PCRA court that even if Appellant's counsel had requested a *crimen falsi* instruction and the jury had disregarded Ms. Cook's testimony, there remained overwhelming evidence of Appellant's guilt. Additionally, the jury heard about Ms. Cook's prior crimes and her agreement with the Commonwealth throughout the trial as discussed herein.

For these reasons, there is not a reasonable probability that the result of the trial would have been different. *See Treiber*, 121 A.3d at 444. Therefore, we agree with the PCRA court that Appellant has not proven that

he was prejudiced by trial counsel's failure to request the *crimen falsi* jury instruction. ***Spotz***, 84 A.3d at 311; ***Baker***, 880 A.2d at 656. Because Appellant cannot establish the prejudice prong of the test for ineffective assistance of counsel, his claim fails. ***Spotz***, 84 A.3d at 311.

In sum, we conclude that Appellant's claim of ineffective assistance of counsel merits no relief. Accordingly, we affirm the PCRA court's order dismissing Appellant's PCRA petition.

Order affirmed.


Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 04/26/2021