J-S25041-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| Appellee | : | |
| | : | |
| v. | : | |
| | : | |
| LARRY BENEFIELD FASON | : | |
| | : | |
| Appellant | : | No. 224 WDA 2022 |

Appeal from the PCRA Order Entered February 2, 2022
In the Court of Common Pleas of Cambria County
Criminal Division at No(s): CP-11-CR-0000168-2018

BEFORE: BENDER, P.J.E., DUBOW, J., and KING, J.

MEMORANDUM BY KING, J.:                    **FILED: FEBRUARY 3, 2023**

Appellant, Larry Benefield Fason, appeals from the order entered in the Cambria County Court of Common Pleas, which denied his petition brought under the Post-Conviction Relief Act ("PCRA").[1] We affirm.

A prior panel of this Court set forth the facts and procedural history of this case as follows:

> On November 5, 2017, Johnstown Police Department officers and detectives were dispatched to the area of Bell Place and Messenger Street in Johnstown, Pennsylvania, after a report of a deceased body. When they arrived on the scene, they observed a deceased female lying in an apartment complex's trash receptacle area. The deceased, later identified as Angela Lunn (Victim), a known acquaintance of Appellant, was partially clothed and had multiple contusions on her face and head.
>
> Upon investigation, detectives noticed droplets of blood

---

[1] 42 Pa.C.S.A. §§ 9541-9546

"leading from [Victim] up to the staircase to the rear of an apartment complex." N.T., 7/16/19, at 78. The blood trail led to a third floor apartment, where Appellant resided. Appellant allowed police to enter the apartment to remove some of Victim's personal belongings. Once inside, police immediately were "hit with a very strong smell of cleaning products; ammonia, like Clorox type smell." N.T., 7/17/19, at 59. The police also noticed blood stains around the kitchen sink and droplets of blood on the floor, which appeared "to be the same blood trail leading out the door." N.T., 7/16/19, at 81.

Police obtained a "body warrant" for Appellant, seeking photographs of his body, as well as samples of his blood, DNA samples, pubic hair, hair follicles, and fingernail clippings. Appellant was transported to a local hospital where a Sexual Assault Nurse Examiner (SANE) examined Appellant and found blood on his finger, right foot, left toes, and underneath his left foot toenails. The officers also obtained a search warrant for Appellant's apartment, where they recovered a "jug" of ammonia and a "jug" of detergent from the kitchen, and a tire iron, which was sticking out of a water jug in the master bedroom.

Upon noticing a surveillance camera facing the trash bin area, Detective Sergeant Corey Adams contacted the manager of the Elks Lodge to view the video beginning at midnight the night before. … The recording, which was played for the jury at trial, showed Victim arrive at the apartment complex at 4:15 a.m. on November 5th. At approximately 5:30 a.m., Appellant could be seen placing two "shopping bags" inside a dumpster. An hour later, the video showed Appellant positioning Victim's body in the trash bin area before returning to his apartment. … The detective later retrieved the shopping bags from the dumpster and discovered "numerous rags and towels soaked with blood, clumps of hair, … a pillowcase saturated in blood, and other pieces of garbage." [N.T., 7/16/19, at 142.]

\* \* \*

The trial court summarized the testimony of forensic pathologist Dr. Kevin Whaley regarding Victim's injuries as

- 2 -

follows:

> [Dr.] Whaley testified that [Victim] suffered numerous defensive and blunt force traumas that resulted in a variety of injuries and that three of those injuries would have been fatal with one being immediately fatal.
>
> [Dr.] Whaley testified that [Victim's] injuries from the blunt force trauma included: a fracture to her mandible; a right and left basilar skull fracture; diffuse subgaleal hemorrhaging, where blood pools under the scalp; [subarachnoid] hemorrhaging where blood pools around the brain; cerebrospinal fluid leaking from the left ear canal through the left side basilar fracture across the petrous ridge; a green stick fracture to her right arm's ulna; a comminuted fracture of her right wrist bones; a fracture to the left arm's ulna bone; fractures to the front and sides of her left ribs numbers 3-7; a punctured left upper lung lobe resulting from a broken rib entering the lung; fractures to the front and sides of her right ribs numbers 2 and 6-10; her right ear being partially torn off; a lacerated spleen resulting from a broken rib piercing the organ; vaginal and rectal tearing; her left ear being damaged; hair torn from the scalp; and multiple abrasions, lacerations and bruises over her body. [Dr.] Whaley explained that [Victim's] injuries to her arms were consistent with defensive injuries that result when a person attempts to shield the head or body with their forearms.
>
> [Dr.] Whaley testified that the bruising on [Victim's] buttocks, chest, abdomen, thighs, arms, and chin suggested it had been caused by a weapon since the bruising showed a tram track pattern…. Based on the bruises here [Dr.] Whaley concluded [Victim] had been struck repeatedly and with significant force by a long and narrow diameter object, such as a rod or board, on her head, chest, abdomen, arms, legs, buttocks, and chin….
>
> [Dr.] Whaley explained, that of the injuries [Victim] sustained three would be fatal with one resulting in

J-S25041-22

immediate death. [Dr.] Whaley noted that both the punctured lung and lacerated spleen would have resulted in [Victim's] death unless immediate medical aid was provided. He noted that there was little blood loss from [Victim's] lung or spleen injury into the body cavity indicating that the injuries occurred immediately prior to or after [Victim's] death when her blood pressure was minimal to nonexistent. [Dr.] Whaley explained that a person with a left side basilar fracture like [Victim's] would be able to survive for a period of time without medical attention but would eventually die without aid[.] He explained that a similar right side basilar fracture would be "most immediately lethal" as it would result in damage to the brain stem resulting in the shutdown of a person's autonomic functions such as heart rate and respiration. [Dr.] Whaley testified that it would take a significant blow to cause such a right side basilar fracture as the bone in that area is the thickest in the body. He opined that based upon the autopsy[,] it was likely caused by the blow to [Victim's] chin with the force resulting in the fractured jaw and traveling through the skull to cause the two basilar fractures and injury to the brain stem…. Finally, he opined that such a right side basilar fracture could not be caused by a simple fall or a normal fall down stairs.

Trial Ct. Op., 1/27/20, at 8-10.

Forensic testing revealed one hair fragment, but no blood on a tire iron recovered from Appellant's apartment. With regard to the items sent for DNA testing, Appellant's DNA matched DNA found under the nails of Victim's hands. Victim's DNA matched the blood sample recovered from Appellant's left toes and boxer shorts, as well as various blood samples recovered from Appellant's apartment. Moreover, "DNA from the four human hairs recovered from the clumps located in the dumpster contained one DNA profile that was a match to [Victim]."

Appellant testified to the following in his own defense at trial. In the early morning hours of November 5, 2017, Victim came to his apartment with "bruises on her face, … [h]er lip was busted[, and s]he was leaking blood from her

- 4 -

mouth." N.T., 7/18/19, at 52. Victim asked to use his bathroom, and borrowed some towels so she could "wash up." The two then smoked "weed" and "crack cocaine." Appellant started to get "piss[ed] off" when Victim neglected to use an ashtray, and let the ashes from her cigarettes fall on the floor. As he attempted to sweep up the ashes, he and Victim had words, and she bit his finger. At that point, Appellant pushed her "kind of rough." Appellant explained: "She came back — she like had her head on my chest, … and then I pushed her off me again a little harder[, and] she fell and hurt herself on the wall." [*Id.* at 57.]

He told the detectives that he "just F-ing snapped out" because he was angry at Victim for messing up his apartment. Appellant then put the bloody rags Victim used to clean herself in a garbage bag, and took them to the dumpster. He also began cleaning the blood spots throughout the apartment with disinfectant. Shortly thereafter, Appellant discovered Victim "broke [his] weed plant[,]" at which point, he told her she "really [had] to go." As Victim started down the steps, "[s]he got her feet messed up on the top of the step, and . . . fell backwards" to the second floor landing. *Id.* at 61. Appellant helped her up, and as she was holding his arm for support, she lost her grip, and fell "straight down" the rest of the steps, and struck her head on a pillar. Victim got up and walked a few steps before collapsing. Appellant admitted he then dragged her to the dumpster area before returning to his apartment. He claimed he never meant to hurt her, and he "thought she was okay" because she was still mumbling when he left her. On cross-examination, Appellant stated he "told a lot of pieces of lies" to the police because he was scared and "in shock" because they had just gotten him out of bed and told him Victim was dead. N.T., 7/18/19, at 69. He also claimed he was afraid the police would charge him with a crime simply because he is black and Victim was white.

The Commonwealth presented one rebuttal witness, biochemical engineer and accident reconstructionist, Dr. Andrew Rentschler, who opined the basilar skull fracture and other injuries Victim sustained were "inconsistent with a backward fall down the steps[.]." *See* N.T., 7/18/19, at 123. *See also id.* at 115 (explaining Victim did not have

"any depressed or comminuted or splintered-type fractures to her skull [that] you would expect with enough force striking the skull" to cause the basilar skull fracture). Dr. Rentschler testified his opinion would not change even if Victim had been pushed down the steps.

*Commonwealth v. Fason*, 255 WDA 2020, unpublished memorandum at 1-4 (Pa.Super. January 6, 2021) (some internal citations to the record omitted).

On July 19, 2019, a jury convicted Appellant of first-degree murder and aggravated assault. The trial court sentenced Appellant to life imprisonment on September 17, 2019. This Court affirmed the judgment of sentence on January 6, 2021, and Appellant did not petition for allowance of appeal with our Supreme Court. *See id.* Appellant timely filed a *pro se* PCRA petition on April 1, 2021. The PCRA court appointed counsel, who filed an amended PCRA petition on July 28, 2021. The court conducted an evidentiary hearing on September 16, 2021, and denied PCRA relief on February 2, 2022. On February 15, 2022, Appellant filed a timely notice of appeal and a voluntary statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b).

Appellant raises the following issues for our review:

Whether the trial court erred in finding that Appellant's prior trial counsel was not ineffective in failing to call an expert witness to contradict and/or challenge the Commonwealth's medical expert?

Whether the trial court erred in finding that Appellant's prior trial counsel was not ineffective in failing to call a medical expert to rebut the Commonwealth's claim that he caused the decedent's death, as Appellant contends that at the time of the incident which led to the victim's death, that he was in no physical condition to harm or injure the victim as the Commonwealth so alleged?

Whether the trial court erred in finding that Appellant's prior trial counsel was not ineffective in failing to call his next-door neighbor to testify at his trial?

Whether the trial court erred in finding that Appellant's prior trial counsel was not ineffective in failing to call former Johnstown Police Detective Dan Fisher to testify at his trial, as well as a female police officer to testify?

Whether the trial court erred in finding that Appellant's prior trial counsel was not ineffective in failing to object to the jury pool hardly having any minorities?

Whether the trial court erred in finding that Appellant's prior trial counsel was not ineffective in failing to request a change in venue?

Whether the trial court erred in finding that Appellant's prior trial counsel was not ineffective in failing to prepare him to testify at trial?

Whether the trial court erred in finding that Appellant's prior trial counsel was not ineffective in failing to investigate his nephew, DeShawn Jones, as a potential suspect in the matter.

Whether the trial court erred in finding that Appellant's prior trial counsel was not ineffective in failing to object to the constant display of the autopsy photographs by the Commonwealth to the jury.

(Appellant's Brief at 4-5) (reordered for purpose of disposition).

"Our standard of review of the denial of a PCRA petition is limited to examining whether the evidence of record supports the court's determination and whether its decision is free of legal error." **Commonwealth v. Beatty**, 207 A.3d 957, 960-61 (Pa.Super. 2019), *appeal denied*, 655 Pa. 482, 218 A.3d 850 (2019). This Court grants great deference to the factual findings of

the PCRA court if the record contains any support for those findings. *Commonwealth v. Howard*, 249 A.3d 1229 (Pa.Super. 2021). "[W]e review the court's legal conclusions *de novo*." *Commonwealth v. Prater*, 256 A.3d 1274, 1282 (Pa.Super. 2021). Further, "we must defer to the PCRA court's findings of fact and credibility determinations, which are supported by the record." *Commonwealth v. Diaz*, 183 A.3d 417, 421 (Pa.Super. 2018), *aff'd*, 657 Pa. 618, 226 A.3d 995 (2020).

In his first four issues combined, Appellant contends trial counsel was ineffective for failing to call various witnesses in Appellant's defense. Specifically, Appellant asserts that trial counsel failed to call an expert witness to challenge and contradict the Commonwealth's medical expert, Dr. Whaley. Appellant argues that due to trial counsel's failure in this regard, "the jury had no choice but to believe the unchallenged and uncontradicted testimony of Dr. Whaley." (Appellant's Brief at 12). Additionally, Appellant argues that trial counsel was ineffective for failing to call a medical expert to opine on Appellant's weakened physical state. Appellant contends that such an expert would have demonstrated to the jury that Appellant, who was suffering from cancer at the time, was physically incapable of inflicting the injuries that caused Victim's death.

Further, Appellant asserts trial counsel was ineffective for failing to call Appellant's neighbor to testify. Appellant claims he informed trial counsel "of the existence of his next-door neighbor; however, [trial counsel] failed to take

- 8 -

the affirmative steps to contact her in order to get her to testify." *Id.* at 24-25. Additionally, Appellant objects to trial counsel's failure to call Detective Dan Fisher, who gathered evidence at the crime scene in Appellant's case and later resigned from the Johnstown Police Department after pleading guilty to obstruction of justice in an unrelated case. Appellant insists he was prejudiced because "Detective Fisher's testimony could have been impeached based on his subsequent criminal charges and resignation from the Johnstown Police Department." *Id.* at 25. Appellant also asserts that trial counsel was ineffective for failing to call a female police officer, whose name is unknown, because "it is not known what evidence, or lack thereof, she was in possession of." *Id.* at 26-27. Appellant maintains that trial counsel's failure to call these witnesses prejudiced Appellant because their testimony would have corroborated Appellant's account of events. Appellant concludes trial counsel was ineffective for these reasons, and this Court must vacate the order denying PCRA relief. We disagree.

"Counsel is presumed to have rendered effective assistance." *Commonwealth v. Hopkins*, 231 A.3d 855, 871 (Pa.Super. 2020), *appeal denied*, ___ Pa. ___, 242 A.3d 908 (2020).

> [T]o establish a claim of ineffective assistance of counsel, a defendant must show, by a preponderance of the evidence, ineffective assistance of counsel which, in the circumstances of the particular case, so undermined the truth-determining process that no reliable adjudication of guilt or innocence could have taken place. The burden is on the defendant to prove all three of the following prongs: (1) the underlying claim is of arguable merit; (2) that counsel had no

reasonable strategic basis for his or her action or inaction; and (3) but for the errors and omissions of counsel, there is a reasonable probability that the outcome of the proceedings would have been different.

*Commonwealth v. Sandusky*, 203 A.3d 1033, 1043 (Pa.Super. 2019), *appeal denied*, 654 Pa. 568, 216 A.3d 1029 (2019) (internal citations and quotation marks omitted). The failure to satisfy any prong of the test for ineffectiveness will cause the claim to fail. *Commonwealth v. Chmiel*, 612 Pa. 333, 30 A.3d 1111 (2011).

"The threshold inquiry in ineffectiveness claims is whether the issue/argument/tactic which counsel has foregone and which forms the basis for the assertion of ineffectiveness is of arguable merit[.]" *Commonwealth v. Smith*, 167 A.3d 782, 788 (Pa.Super. 2017), *appeal denied*, 645 Pa. 175, 179 A.3d 6 (2018) (quoting *Commonwealth v. Pierce*, 537 Pa. 514, 524, 645 A.2d 189, 194 (1994)). "Counsel cannot be found ineffective for failing to pursue a baseless or meritless claim." *Commonwealth v. Poplawski*, 852 A.2d 323, 327 (Pa.Super. 2004).

"Once this threshold is met we apply the 'reasonable basis' test to determine whether counsel's chosen course was designed to effectuate his client's interests." *Commonwealth v. Kelley*, 136 A.3d 1007, 1012 (Pa.Super. 2016) (quoting *Pierce, supra* at 524, 645 A.2d at 194-95).

> The test for deciding whether counsel had a reasonable basis for his action or inaction is whether no competent counsel would have chosen that action or inaction, or, the alternative, not chosen, offered a significantly greater potential chance of success. Counsel's decisions will be

considered reasonable if they effectuated his client's interests. We do not employ a hindsight analysis in comparing trial counsel's actions with other efforts he may have taken.

*Commonwealth v. King*, 259 A.3d 511, 520 (Pa.Super. 2021) (quoting *Sandusky, supra* at 1043-44).

"To demonstrate prejudice, the petitioner must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different. [A] reasonable probability is a probability that is sufficient to undermine confidence in the outcome of the proceeding." *Commonwealth v. Spotz*, 624 Pa. 4, 33-34, 84 A.3d 294, 312 (2014) (internal citations and quotation marks omitted). "[A] criminal defendant alleging prejudice must show that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Hopkins, supra* at 876 (quoting *Commonwealth v. Chambers*, 570 Pa. 3, 22, 807 A.2d 872, 883 (2002)).

For claims of ineffectiveness based upon counsel's failure to call a witness:

> A defense attorney's failure to call certain witnesses does not constitute *per se* ineffectiveness. In establishing whether defense counsel was ineffective for failing to call witnesses, a defendant must prove the witnesses existed, the witnesses were ready and willing to testify, and the absence of the witnesses' testimony prejudiced petitioner and denied him a fair trial.

*Commonwealth v. Cox*, 603 Pa. 223, 267-68, 983 A.2d 666, 693 (2009) (internal citations omitted). A petitioner "must show how the uncalled

- 11 -

witnesses' testimony would have been beneficial under the circumstances of the case." *Commonwealth v. Gibson*, 597 Pa. 402, 441, 951 A.2d 1110, 1134 (2008).

Instantly, Appellant claims that trial counsel was ineffective in failing to call medical expert witnesses to contradict the Commonwealth's medical expert testimony on Victim's injuries and to opine on Appellant's physical state at the time of the murder. Nevertheless, Appellant failed to identify any medical experts that were available and willing to testify in a manner that would have been beneficial to Appellant's defense. *See Cox, supra*; *Gibson, supra.* Appellant's contention that a medical expert retained by trial counsel would have come to a different conclusion than the Commonwealth's medical expert about Victim's injuries is pure speculation. Similarly, Appellant did not present any evidence other than his own self-serving testimony to establish that there was a medical expert who was available and willing to opine that Appellant was too physically weak to cause Victim's injuries. This claim is particularly dubious because of the surveillance video evidence showing Appellant maneuvering Victim's body on the night of the murder. On this record, we agree with the PCRA court that Appellant failed to meet his burden of proof to establish ineffective assistance of counsel regarding the failure to call medical experts. *See id.*; *Beaty, supra*.

Further, the PCRA court found trial counsel was not ineffective for failing to call Appellant's neighbor to testify. The record supports the court's

conclusion. There is no dispute that Appellant's neighbor passed away prior to Appellant's trial, making her unavailable to testify. Appellant provides no relevant authority or evidence to demonstrate that counsel was unreasonable for failing to preserve the neighbor's testimony prior to her death. We also note that Appellant is again merely speculating that the neighbor saw or heard anything that would have been beneficial to Appellant's defense. *See Gibson, supra*.

Likewise, Appellant failed to demonstrate that either of the police officers Appellant fault trial counsel for failing to call as witnesses knew information that was relevant or beneficial to Appellant's defense. Appellant fails to provide a name for the female officer and offers no evidence about what information to which she could have testified in support of Appellant's defense. Regarding Detective Fisher, the PCRA court credited trial counsel's testimony that he interviewed Detective Fisher and determined that Detective Fisher did not have any relevant information that would be helpful to Appellant's case and would only serve to be a distraction. Appellant does not refute trial counsel's assessment of Detective Fisher's testimony but merely asserts that trial counsel could have impeached him based on infractions in an unrelated case. As such, Appellant failed to establish that Detective Fisher's testimony would have been beneficial for his defense. *See id.* Accordingly, we discern no error in the PCRA court's determination that Appellant's claims of ineffective assistance of counsel based on failure to call witnesses were

without merit. *See id.*; *Beaty, supra*.

In his fifth issue, Appellant contends that the process utilized by Cambria County to select jurors systematically excludes minorities from the jury pool, which resulted in a disproportionately low number of minorities in the jury pool for Appellant's trial. Appellant argues that trial counsel's failure to object to the disproportionate number of minorities in the jury pool was unreasonable. Appellant asserts that trial counsel's failure compromised Appellant's Sixth Amendment right to have a fair and impartial trial heard by a jury of his peers. Appellant concludes trial counsel's failure in this regard amounts to ineffective assistance of counsel and we should vacate the order denying his PCRA petition. We disagree.

To establish a *prima facie* violation of the requirement that a jury array fairly represent the community, Appellant must show:

> (1) the group allegedly excluded is a distinctive group in the community; (2) the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such people in the community; and (3) this underrepresentation is due to systematic exclusion of the group in the jury selection process. "Systematic" means caused by or inherent in the system by which juries were selected. Proof is required of an actual discriminatory practice in the jury selection process, not merely under-representation of one particular group. The defendant bears the initial burden of presenting *prima facie* evidence of discrimination in the jury selection process.

*Commonwealth v. Johnson*, 576 Pa. 23, 55, 838 A.2d 663, 682 (2003), *cert. denied*, 543 U.S. 1008, 125 S.Ct. 617, 160 L.Ed.2d 471 (2004) (internal citations omitted).

Instantly, trial counsel testified that he did not believe a challenge to the racial composition of the jury pool was warranted because the African American population in Cambria County was relatively small and there were several African Americans in the jury pool. Appellant failed to produce any evidence to refute counsel's assessment of the merits of such a challenge other than unsupported conclusory statements that Cambria County systematically excludes minorities from the jury pool. *See id.* Accordingly, we agree with the PCRA court that there was no arguable merit to an objection to the racial composition of the jury pool and as such, Appellant's ineffective assistance of counsel claim fails. *See id.*; *Sandusky, supra*; *Poplawski, supra*.

In his sixth issue, Appellant avers that the extensive pre-trial publicity regarding his trial tainted the jury pool such that a change in venue was warranted. Appellant claims trial counsel had no reasonable basis for failing to request a change in venue. Appellant concludes that trial counsel's failure prevented him from having a fair and impartial jury, and the PCRA court erred in concluding that trial counsel provided effective assistance. We disagree.

"As a general rule, for a defendant to be entitled to a change of venue because of pretrial publicity, he or she must show that the publicity caused actual prejudice by preventing the empaneling of an impartial jury." *Commonwealth v. Bardo*, 629 Pa. 352, 409, 105 A.3d 678, 712 (2014) (quoting *Commonwealth v. Briggs*, 608 Pa. 430, 12 A.3d 291 (2011), *cert.*

*denied*, 565 U.S. 889, 132 S.Ct. 267, 181 L.Ed.2d 157 (2011)).  "The mere existence of pretrial publicity alone, however, does not constitute actual prejudice."  ***Id.***

> Nevertheless, our [Supreme] Court has recognized that there are some instances in which pretrial publicity can be so pervasive and inflammatory a defendant does not have to prove actual prejudice.  Prejudice will be presumed whenever a defendant demonstrates that the pretrial publicity: (1) was sensational, inflammatory, and slanted toward conviction, rather than factual and objective; (2) revealed the defendant's prior criminal record, if any, or referred to confessions, admissions or reenactments of the crime by the defendant; or (3) derived from official police or prosecutorial reports.  However, if the defendant proves the existence of one or more of these circumstances, a change of venue will still not be compelled unless the defendant also demonstrates that the presumptively prejudicial pretrial publicity was so extensive, sustained, and pervasive that the community must be deemed to have been saturated with it, and that there was insufficient time between the publicity and the trial for any prejudice to have dissipated.

***Bardo, supra*** at 409-10, 105 A.3d at 712-13.

Instantly, Appellant once again merely makes conclusory statements that trial counsel was ineffective in failing to request a change of venue based on pretrial publicity.  Appellant failed to present any evidence of actual prejudice as a result of pretrial publicity or evidence regarding the nature, extent and content of pretrial publicity such that prejudice could be presumed.  ***See id***.  Additionally, trial counsel testified that he discussed the possibility of requesting a change of venue with Appellant and made a strategic choice to not do so because of the risk that the case could be transferred to a county

with an even smaller African American population. On this record, we agree with the PCRA court that Appellant failed to establish that a change of venue request would have been meritorious or that trial counsel's actions were unreasonable under the circumstances. *See id.*; *King, supra*; *Sandusky, supra*; *Poplawski, supra*.

In his seventh issue, Appellant argues that trial counsel failed to prepare him to testify for trial and did not properly advise him "of the potential harms and dangers he may face from cross-examination by the Commonwealth." (Appellant's Brief at 21). Appellant avers that trial counsel only informed Appellant that he would be testifying at the beginning of trial and failed to discuss the content of Appellant's testimony with him before he got on the stand. Appellant argues that trial counsel's failure to prepare him to testify "constituted a total abandonment of counsel, as well as an abdication of the minimum performance required of defense counsel". *Id.* at 22. Appellant concludes the PCRA court erred in finding that trial counsel did not provide ineffective assistance of counsel and we should vacate the order denying PCRA relief. We disagree.

Here, the PCRA court credited trial counsel's testimony contradicting Appellant's claims regarding his testimony at trial. Trial counsel testified that he believed Appellant needed to testify and had multiple discussions with Appellant about his testimony prior to trial. Trial counsel further testified that he properly prepared Appellant to testify, noting that they went over all the

areas that trial counsel would ask him on direct examination and discussed the possible issues that the Commonwealth may raise on cross examination. As it is strictly within the purview of the PCRA court to make credibility determinations, we discern no error in the court's determination that Appellant's claim is without merit. **See Diaz, supra**; **Beaty, supra**.

In his eighth issue, Appellant asserts that trial counsel failed to investigate his nephew, DeShawn Jones, as a potential suspect in Victim's murder. Appellant submits that he told trial counsel that Mr. Jones periodically resided in Appellant's apartment, but trial counsel made no effort to investigate whether Mr. Jones was present on the night of the murder. Appellant claims that Mr. Jones suspiciously disappeared right after the murder and trial counsel "should have made an effort to contact or locate this individual, so that he could have been used in Appellant's defense." (Appellant's Brief at 31). Appellant concludes that trial counsel's failure to investigate Mr. Jones was ineffective assistance of counsel and we should vacate the order denying PCRA relief. We disagree.

This Court has explained:

> A claim that trial counsel did not conduct an investigation or interview known witnesses presents an issue of arguable merit where the record demonstrates that counsel did not perform an investigation. It can be unreasonable *per se* to conduct no investigation into known witnesses. A showing of prejudice, however, is still required.

**Commonwealth v. Stewart**, 84 A.3d 701, 712 (Pa.Super. 2013) (internal citations omitted).

- 18 -

Here, the PCRA court found that trial counsel attempted to investigate Mr. Jones as a possible suspect and/or witness. Trial counsel testified that after Appellant raised his suspicions about Mr. Jones, trial counsel made inquiries about Mr. Jones but was unable to find any evidence that Mr. Jones was at the apartment on the night of the murder. Additionally, despite trial counsel's efforts, he could not locate Mr. Jones prior to trial. Appellant admitted that Mr. Jones disappeared after Victim's murder and his whereabouts were still unknown at the time of the PCRA hearing. On this record, we discern no error in the court's determination that Appellant failed to demonstrate arguable merit on this claim. *See id.*; *Beaty, supra*. Additionally, we note that there is no evidence that Mr. Jones was present on the night of the murder or had any relevant information to help Appellant's defense. Accordingly, Appellant failed to establish that he suffered prejudice, and his ineffective assistance of counsel claim fails. *See Sandusky, supra*; *Spotz, supra*.

In his ninth issue, Appellant argues that trial counsel was ineffective for failing to object when the Commonwealth displayed autopsy photographs of Victim to the jury. Appellant contends the photographs were highly inflammatory and trial counsel admitted that he should have objected when they were presented to the jury. Appellant concludes the PCRA court erred in finding that trial counsel's failure to object was not ineffective assistance of counsel and we should vacate the order denying PCRA relief. We disagree.

The principles that govern the admittance of post-mortem photographs of the victim are as follows:

> Photographs of a murder victim are not *per se* inadmissible. The admission of such photographs is a matter within the discretion of the trial judge. The test for determining the admissibility of such evidence requires that the court employ a two-step analysis. First a court must determine whether the photograph is inflammatory. If not, it may be admitted if it has relevance and can assist the jury's understanding of the facts. If the photograph is inflammatory, the trial court must decide whether or not the photographs are of such essential evidentiary value that their need clearly outweighs the likelihood of inflaming the minds and passions of the jurors.
>
> In addition, this Court has observed that [a] criminal homicide trial is, by its very nature, unpleasant, and the photographic images of the injuries inflicted are merely consonant with the brutality of the subject of inquiry. To permit the disturbing nature of the images of the victim to rule the question of admissibility would result in exclusion of all photographs of the homicide victim, and would defeat one of the essential functions of a criminal trial, inquiry into the intent of the actor. There is no need to so overextend an attempt to sanitize the evidence of the condition of the body as to deprive the Commonwealth of opportunities of proof in support of the onerous burden of proof beyond a reasonable doubt.

*Commonwealth v. Tharp*, 574 Pa. 202, 222, 830 A.2d 519, 531 (2003), *cert. denied*, 541 U.S. 1045, 124 S.Ct. 2161, 158 L.Ed.2d 736 (2004) (internal citations omitted).

Instantly, the PCRA court observed:

> [C]alling the photographs "autopsy photographs" is a pejorative misnomer. The photographs do not depict [Victim]'s autopsy procedure or the condition of her body during or after the autopsy. Rather, the photographs were taken at the location where the autopsy was performed and

> prior to the autopsy being conducted to show the condition of [Victim's] body and document her injuries.

(PCRA Court Opinion, filed 2/2/22, at 21). The record supports the court's assessment. Additionally, the nature of Victim's injuries and how she sustained them was a significant dispute at Appellant's trial. Pictures of Victim's injuries were important pieces of evidence for the jury to determine the credibility of Appellant's testimony and evaluate whether the Commonwealth met its burden of proof. Therefore, despite trial counsel's testimony that in hindsight he should have objected to the photographs, we hold that such an objection would not have been meritorious. **See Tharp, supra**. As such, we discern no error in the PCRA court's conclusion that this claim of ineffective assistance of counsel was without merit. **See Beaty, supra**. Accordingly, Appellant has failed to succeed on any of his claims of ineffective assistance of counsel and we affirm the PCRA court's order denying relief.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date:  2/3/2023